UNION BLDG. CO. OF PENNSYLVANIA v.
PENNELL et al.
No. 5815.

Circuit Court of Appeals, Third Circuit.
July 19, 1935.

I. Emanuel Sauder, of Philadelphia, Pa., for appellant.

Grover C. Ladner, Cornelius Haggarty, Jr., and Harry Felix, all of Philadelphia, Pa., for appellees.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

DAVIS, Circuit Judge.

This is an appeal from a decree of the District Court declaring the title to certain fixtures to be in the receivers of the Almar Stores Corporation on the

ground that they were trade fixtures and did not become part of the real estate.

In 1929 the Almar Stores Company, hereinafter called the Almar Company, a chain of grocery stores, desired to acquire a warehouse and bakery suitable for its particular purposes. Accordingly it employed the Ballinger Company of Philadelphia, a firm of experienced engineers and contractors, which specialized in building warehouses of the type required by the Almar Company, to make a detailed study of the needs of the company. Pursuant to this employment, the Ballinger Company sent its officers about the country to inspect warehouses and bakeries and to secure bids from various contracting firms for the erection of the buildings which the Almar Company required.

After having decided just what it wanted, the Almar Company entered into a written agreement on July 20, 1929, with the Union Building Company of Pennsylvania, hereinafter called the Union Company, whereby that company agreed to erect for the Almar Company a brick and concrete grocery warehouse and bakery at Tenth and Sommerville streets in the city of Philadelphia (on land which it purchased for $40,000), containing approximately 98,000 square feet of space, with plumbing, heating, electrical, and elevator systems, at a cost of $305,000. All of the manufacturing equipment was to be installed by the Almar Company. The agreement provided that the proposed lease of the warehouse and bakery would be for a period of twenty years at a rental of $31,000 a year, plus taxes, water rent, and insurance, with an option to the Almar Company to purchase the buildings within five years at a price equal to the cost of construction and all other charges, with the reservation of the right to increase both the rent and the purchase price if the estimated cost was exceeded.

The Union Company instructed the Ballinger Company to make the buildings suit the needs of the Almar Company. This necessitated, during the progress of the building operation, frequent conferences between the Ballinger Company and the Almar Company, and as a result, many changes were made at the suggestion of the Almar Company in order to provide buildings which would enable it to conduct its business efficiently and economically. The entire building was planned with the idea of meeting the needs of the Almar Company, whose president said on various occasions that this was to be its permanent home.

On November 26, 1929, the Union Company entered into a lease with the Almar Company for the warehouse and bakery for a term of twenty years at an annual rent of $43,000, instead of $31,000, plus real estate taxes, water rent, and insurance, with an option to purchase them within five years at $473,500, instead of the contract price of $305,000; the increase being due to additional cost made necessary by the changes in the plans suggested by the Almar Company.

The following is a list of the property over which this controversy exists: " * * * electric coffee roasting machine; electric weighing scale; electric refrigeration plant; electric refrigerators and ice boxes; platform scales; computing scales; large slicing machines, hand slicing machines; electric trucks; hydraulic trucks and platforms; meat racks; 100 steel grocery selecting trucks; 16 sets of wedge blocks and rails; 400 feet of wire partitions; 2 produce storage ice boxes; 1 meat storage ice box equipped with rail and rail scale and built in platform scale; 1 electric truck charger; 1 butter storage ice box; 1 egg storage ice box; 1 egg candling machine; 7 lift trucks; 2 electric lift trucks; 750 platform skids; 1 ice storage tank; 1 work bench; 1 Battle Creek bread wrapper and slicer; 1 Severige bread wrapper; 35 bread trucks; 20 cage trucks; 1 air conditioner and steam room; 1 proofer; 1 divider; 1 dough raiser; 300 bread trays; 700 4-loaf bread pans; 7 trucks; 1 Baker & Perkins oven; 1 gas range; 1 cake icing mixer; 1 bakery work table; 1 flour mixer; 1 dough mixer; 1 Fairbanks floor scale; 1 York air conditioner and humidifier; 15 dough troughs; 1 doughnut machine; 1 doughnut sugarer; 1 Glen cake mixer; 1 miscellaneous lot of cake pans; 1 bakery storage ice box; 1 bread conveyor; steel cages; 2 printing presses; 1 typesetter; 3 type cabinets; 1 paper perforator; 1 paper cutter; 1 letter folding machine; 1 mimeograph; 5 small safes; 2 large safes; 300 feet chestnut partition rails; 300 feet chestnut office partitions, (glass); 40 4-drawer letter files; 25 electric fans; 10 comptometers; 6 adding machines; 45 desks; 15 office tables; chairs; typewriters; check writers; metal safe cabinets."

Some of this property was bolted, screwed, and built into the buildings; another portion, while movable, not being bolted or screwed to the real estate, was part of and necessary to the operation of the machinery which was physically attached to the realty; the third part of the property, while movable, was used in, and was necessary to, the operation of the bakery and warehouse as a working plant.

In order to apply the law to the questions relating to this machinery, apparatus, and equipment properly, it is necessary to understand their relation to the buildings and their functions. The Union Company describes them as follows:

"Of the equipment physically attached to the real estate, the coffee roasting machinery, consisting of various units, such as the roaster, a bin moving on a track imbedded in the concrete floors, blowers or fans, motors, conveyors and scale, all connected by lengths of galvanized iron pipe at least one foot in diameter, is located on the second floor of the warehouse, part of its machinery extending up through the roof where it is protected by a specially built penthouse, and other parts thereof passing through at least eight openings in the floor to the floor below. This equipment is fastened to the roof and affixed by angle irons and bolts in many places to the ceiling and the floor of the second floor and to the ceiling and floor on the first floor of the warehouse. Of these eight openings in the floor, one is three feet by eight feet, and the others about one foot in diameter.

"The bakery machinery equipment and apparatus extends from the third floor of the bakery building, through the second and first floors to the basement, where the refrigeration plant, with which it is connected, is located. The bakery operations begin on the third floor where the flour is mixed in a flour mixer and divider. This is of wooden construction fastened to the floor by bolts on four sides and to the ceiling by bolts and connecting rods, as well as to a motor.

"The mixed flour is carried by conveyors of wooden and metal construction through a wall into the next room. Here another series of conveyors, extending from the floor to the ceiling and through the roof, of wood and metal construction, fastened to the floor and ceiling by hundreds of bolts carries the flour to the dough mixer. This latter machine is of steel construction, extending from the floor to the ceiling, weighing hundreds of pounds, bolted top and bottom, motor driven and connected by pipes to the ice water and to hot water running from the refrigeration plant and the heating plant in the basement. Here there is also a Fairbanks scale imbedded in the concrete floor about twelve to fourteen inches, its platform being fourteen feet by fourteen feet.

"The mixed dough is then allowed to raise in long metal movable dough troughs. This raising room is equipped with double window sashes and a humidifying apparatus to keep the temperature of the room even. This machine is of metal, is electrically driven, fastened to the floor and ceiling, connected by flues and pipes to both the refrigeration and heat plants located in the basement and through the roof.

"An opening in the floor leads to other machinery on the floor below. The dough passes from the troughs through the hole in the floor to the apparatus below, where it is divided and weighed. This divider is of metal construction, electrically driven, and fastened to the floor by bolts and to the ceiling by angle irons and bolts.

"On this same floor is the kneading machine which rolls the dough. This machine is of metal, and bolted to the concrete floor. A series of pans, carried by conveyors more than twenty feet long, fastened to the floor by bolts and hung from the ceiling by iron supports and bolts, agitates the dough to make it raise. After being rolled again, it is placed in pans, and wheeled upon steel tracks imbedded in the floor into the conditioning oven. This is of steel, bolted to the floor, and connected by pipes controlled by a humidifier, also bolted to the floor, providing currents of hot and cold air from the refrigerating and heat apparatus in the basement.

"The baking oven is approximately sixty feet long, operated by gas, electrically fired. It is of metal, weighing thousands of pounds, bolted to the floor, with a metal and brick coping about a foot high running the entire length of the oven, fastened by connections for gas, water and electricity and with copper and other metal flues and pipes necessary for its operation. It would have to be com-

pletely dismantled in order to be removed from the building.

"A moving conveyor bolted to the floor then carried the bread to a steel spiral slide or chute which runs through an opening about six feet long and three feet wide to the floor below. This slide is bolted to the floor and is attached to a motor driven conveyor. The bread was then sliced and wrapped upon other machines electrically connected and driven, and which were originally bolted to the floor.

"Of the other machinery attached to the real estate, the refrigeration machinery pumps, tanks and condensers located in the basement not only furnish refrigeration to the warehouse and the various cold rooms for meat, eggs, butter, cheese and produce, but also cold air and water to the dough mixer and to the humidifier on the third floor and to the humidifier on the second floor of the bakery building. The piping is fastened by bolts and tracks to the walls of the building and by means of bolts through the special concrete foundation into the floor. The pipes are covered with cork and run through openings provided in the walls and floors to the first and second floors in the warehouse and to the second and third floors in the bakery, with special sockets and metal connections for holding the pipes in the walls. These pipes range from four inches to ten inches in diameter. Removal of this equipment would leave thirty-five to fifty openings in walls and floors throughout the buildings; would render the cold rooms in the warehouse useless and would prevent the use of the humidifiers in the operation of the bakery.

"The special wire partitions, with sliding gates, located opposite the loading platforms on the first floor of the warehouse, were part of the system adopted to handle merchandise and were essential to the cage system of delivering goods to each truck. This wire caging was fastened to the building by means of holes cut into the floor and by means of iron sockets attached to the structure of the building by bolts.

"The steel rails which constitute part of the meat handling equipment are fastened to the elevator, refrigerator room and platform ceilings by bolts and innumerable hanging irons. Their removal would leave holes in the ceilings, and would prevent the efficient method of handling meats, for which the building was designed.

"The Fairbanks scale located in the meat box is hung upon flanges imbedded in the concrete floor and its removal would leave a hole twelve feet by fifteen feet and twelve inches deep.

"That, of the articles not fastened, the hundreds of skids, hand trucks and electric trucks were specially designed and used by Almar for the efficient storage and moving of merchandise in the warehouse. The partitions and rails, linoleum, office equipment of desks, typewriters, etc., formed part of the general offices and were used in connection with the operation of the warehouse and bakery. The partitions were fastened to the floor by four angle irons and screws, and the linoleum was glued to the floor and could not be removed without being destroyed."

On October 10, 1930, the Almar Stores Company, after occupying the buildings for nearly a year, went into receivers' hands and the property mentioned above, or some of it, was later sold to a new company called the Almar Stores Corporation, hereinafter called the Almar Corporation. On March 26, 1931, the lease to the Almar Company was assigned to the Almar Corporation, which agreed to perform all of its terms, covenants, and conditions with certain modifications not here important, and on December 5, 1932, receivers in equity were appointed for the Almar Corporation. They conducted the business until November, 1933, when, among other things, they began to sell the machinery, equipment, and apparatus here in question.

The Union Company claimed this property as part of the realty and filed a petition asking that it be withdrawn from the assets which had been scheduled for public sale. The question of title was referred to a special master, who held that the fixtures were trade fixtures which had never become part of the real estate.

Exceptions were filed to this report, and especially to the conclusions based upon the record of equity receivership proceedings against the Almar Company in 1931 which had not been offered in evidence in this case. The master sustained the exceptions to this part of the report, filed a supplemental report, and reaffirmed his former findings and recommendations.

Exceptions were then filed to both reports. The District Court dismissed them and held that the evidence showed no intention to affix the "chattels" to the realty and that the lease failed to bar the right of the lessor to remove the "chattels." Accordingly, a decree was entered awarding them to the Almar Corporation and the case is here on appeal.

The learned District Judge correctly held that whether a fixture, installed in a plant by a lessee, remains personal property and is removable at the termination of the lease, or becomes part of the realty and is not removable, depends upon the intention of the parties. He found that the "apparent acquiescence of the lessor in the appraisement of the equipment in question as the property of the" Almar Company when it went into receivers' hands in October, 1930, followed by the assent of the lessor, in open court, to the sale of the equipment by the receivers of the Almar Company and the acceptance of a bill of sale for the equipment from the Almar Corporation, substituted lessee, indicated sufficient intention of the parties to support his conclusion.

But the appellees here disregard the facts which the court thought "highly evidential" and plant themselves squarely on the lease. However, the Union Company denied that it assented in open court to the sale of the equipment and says that there is no evidence of its "apparent acquiescence" in the appraisement of the equipment as the property of the Almar Company. It further says that these, if true, together with the acceptance of the bill of sale as collateral security for the performance of the lease by the new lessee, cannot change the fact that they became a part of the real estate in 1929 and are not removable. In re Beeg (D. C.) 184 F. 522; Carver et al. v. Gough, 153 Pa. 225, 25 A. 1124.

The court intimates that a correct interpretation of the lease might determine this case in favor of the Union Company, or, at least, that "the citations and argument of counsel would have force if the premises leased had been leased as vacant premises (in) which the lessee had afterwards installed his machinery and other equipment," but that the machinery and other equipment were installed in the building "prior to the drafting and execution of the lease," and since that is

true the words "improvements, additions, or alterations," in clause 9, contemplate only such improvements, additions, or alterations as were made after the execution of the lease, and as none were made, the lease does not bar the removal of the equipment by the lessee.

But the Union Company, lessor, says the lease was executed on November 6, 1929, and that the Almar Company was then insisting that the buildings be completed by December 1, 1929; but they were not, nor on February 3, 1930, when it was urged that an effort be made "to complete the construction of the building without delay." It argues that the equipment could not have been installed on November 6, 1929, but says that if it was and the appellees are relying upon that fact, then they must stand on the terms of the lease which provides that the lessee will return or "deliver up the premises" at the end of the term "as they are now," ordinary wear and tear excepted, and that such delivery or return of the premises would include the fixtures then installed.

Regardless of the disputed question of fact as to whether all the fixtures had actually been installed when the lease was executed, we think that the parties meant to have the rules of law as declared and known in Pennsylvania apply to the fixtures then in the buildings and to be put in thereafter. The letters passing between the parties months after the execution of the lease unmistakably show that the buildings were not even then completed and all of the fixtures could not have been installed when the lease was signed.

However, the appellees do not here rely upon the controverted facts. They here say that: "The machinery, equipment and appliances which were put in this building as part of the lessee's plant and were installed in such a way that they can be removed from the building without substantial injury thereto, are personalty and therefore are the property of the bankrupt estate and can be sold as such."

For reasons set forth herein, we think this position is untenable.

■ The real question in this case is whether or not the fixtures here involved are personal property or real estate. If they are personal property, they belong to the receivers and the decree should be affirmed; but if they are real estate, they belong to

the landlord and the decree should be reversed.

Whether or not they are real or personal property depends in the last analysis upon the intention of the parties which must be determined from their relation, from what they did and said, and from the character and function of the property.

■ This case arose in Pennsylvania and the law of that commonwealth is controlling.

While the special master heard the testimony of the witnesses below, the learned District Judge did not see them. However, there are no essential disputed facts involving the credibility of witnesses. The legal conclusions to be drawn from undisputed facts constitute the real problem in this case.

■ The character of the property in question, whether personalty or realty, depends, in the first place, upon the construction of the lease, which is the contract between the parties. It provides in paragraph 9 that the "Lessor reserves the right and Lessee hereby grants the right to Lessor that Lessor or any agent or agents authorized by Lessor, may at any time inspect the demised premises, or enter the same for the purpose of inspecting, making repairs, alterations, additions or improvements to the demised premises or to the building of which the demised premises are part. Lessee agrees that no alterations, additions or improvements to the premises shall be made without first having the consent in writing of the Lessor, and agrees any improvements, additions or alterations, whether attached to the walls and floors or otherwise, made by the Lessee after such consent shall have been given, shall at Lessor's option become the property of Lessor and remain, or shall be removed at the cost of the Lessee and the building restored to its former condition at the expense of the Lessee at the expiration or sooner determination of the lease."

The courts of Pennsylvania have construed similar provisions in leases and defined "improvements, additions and alterations." Nearly thirty years ago Mr. Justice Mestrezat, in one of the leading cases in Pennsylvania, Isman v. Hanscom, 217 Pa. 133, 66 A. 329, discussed these terms. It was a landlord and tenant case in which a property was leased for a restaurant for a term of five years. The lease contained the following provisions: "And the said lessees shall not make any alterations, additions or improvements to the hereby demised premises without first having the consent, in writing of the lessor, and * * * all alterations, additions and improvements made by either of the parties hereto, upon the premises, except movable furniture put in at the expense of the lessees, shall at the option of the lessor remain upon the premises at the expiration or sooner determination of the lease, and be surrendered with the premises, without molestation or injury, and become the property of the lessor * * *."

Mr. Justice Mestrezat in discussing the question as to fixtures said:

"The important and controlling question in this case arises out of the construction of the lease between the parties. The question of trade or tenant fixtures does not enter into the case, and hence need not be considered. The lease, which is the contract between the parties, determines the ownership of the property in question, and hence the rights of the parties thereto depend entirely upon the proper interpretation of the instrument. If the lease had been silent as to the ownership of the various items of property in dispute, then it would have been necessary to determine whether the property was trade fixtures, and if so, to whom it belonged—to the landlord or the tenant. When, however, a landlord and tenant stipulate in their lease as to the ownership of chattels which may be placed upon the demised premises by the tenant, the stipulation will be enforced regardless of what might be the rights of the parties at common law. In such cases, the contract is the law made by the parties themselves, and that must determine their rights. * * *

"As said above, the rights of the parties in this litigation depend upon the interpretation of the contract. We are clear that the structures erected on the demised premises or the chattels installed therein by the defendants are 'alterations, additions, and improvements,' within the terms of the lease, and as such belong to the plaintiff, the landlord, at his option. *These words are of broad signification, and are sufficiently comprehensive to include the various chattels which the defendants installed in the premises.* By

reference to the numerous cases cited in the appellee's paperbook, it will be seen that judicial construction has fixed the interpretation of these words, and gives them a significance that will include each and every item of property installed by the defendants in the demised premises. It would unnecessarily prolong this opinion to cite these authorities. It is difficult to see what change in the premises could be made, or what chattel could be installed therein, or what repairs could be made thereto, which would not be included in the words 'alterations, additions, and improvements.' "

Judge McPherson followed the Isman Case in the case of In re Bahl's Ice Cream & Baking Co. (D. C.) 195 F. 986, 987, as follows:

"No question of trade fixtures is involved in this dispute. By the covenants in the lease, the lessor and the lessee themselves determined who was to own the property now in controversy. Of special importance is the covenant that:

" 'All improvements or additions made by the lessee shall not be detached from the property, but shall remain for the benefit of the lessor.'

"The machinery to which the receiver's claim was finally restricted, namely, twin mixers, four freezers, washer and sterilizer, eleven motors, shafting and belting, brine pump, and german silver connections of mixers, is all embraced by this covenant, and therefore did not pass to the receiver, or to his successor, the bankrupt's trustee. * * * The pending controversy is ruled by Isman v. Hanscom, 217 Pa. [133], 137, 66 A. 329."

The Isman Case was also followed by this court in an opinion by Judge Gray, in Reber v. Conway, 203 F. 12.

In the lease here involved, the Almar Company, the lessee, agreed that "any improvements, additions or alterations, whether attached to the walls and floors or otherwise, made by the lessee after such consent shall have been given, shall at the lessor's option become the property of lessor and remain." The terms "improvements, additions or alterations" were defined by Justice Mestrezat in Isman v. Hanscom, supra. He said it was difficult to see "what change in the premises could be made, or what chattel could be installed therein, or what repairs could be made thereto, which would not be included in the words 'alterations, additions, and improvements.' "

It was contemplated in the lease under consideration that the "improvements, additions or alterations" to be made by the lessee might be attached to the *walls* and *floors* as well as *otherwise*, and the chattels in question were intended to be included in these terms. While alterations, additions, and improvements may be made to buildings themselves, "these words," as Mr. Justice Mestrezat said, "are of broad signification, and are sufficiently comprehensive to include the various chattels which the defendants installed in the premises." If this is true, then the rights of the parties as to these fixtures must be determined by the lease and this under the rule of law in Pennsylvania gives them to the lessor. Accordingly the question of trade fixtures does not enter into the case and need not be considered here.

But assuming that the words "improvements, additions or alterations" do not include the fixtures put into these buildings by the Almar Company and that the lease is silent as to their disposition at the end of the term or sooner determination of the lease, then under the evidence in this case, they could not have been removed by the lessee, but became the property of the lessor and must remain.

The well-settled "Pennsylvania rule," as Mr. Justice Walling said in Titus v. Poland Coal Company, 275 Pa. 431, 119 A. 540, 542, "is that a chattel placed in an industrial establishment for permanent use, and necessary to the operation of the plant becomes a fixture, and as such a part of the real estate, although not physically attached thereto; in other words, if the article, whether fast or loose, be indispensable in carrying on the specific business, it becomes a part of the realty. * * * Whatever is a necessary part of the machinery for carrying on the business is a fixture, irrespective of the manner of its attachment." This rule has been stated and reaffirmed over and over again and recently by Mr. Justice Schaffer in the case of Commonwealth Trust Co. of Pittsburgh v. Harkins, 312 Pa. 402, 167 A. 278.

Judge Kirkpatrick in the Eastern District of Pennsylvania, in the case of In re Highland Silk Company, Inc. (D. C.) 41 F.(2d) 404, declared the same rule as follows: "So far as there is any special rule relating to machinery in man-

ufacturing plants, it goes no further than to hold that where the machinery in question is indispensable to the operation of the *particular* factory, there is a *presumption* that the intention of the owner in placing it in the factory was to permanently affix it to the building and make it part of the realty. Vail v. Weaver, 132 Pa. 363, 19 A. 138, 19 Am. St. Rep. 598; Glasgow v. Hill, 29 Pa. Super. 222. Obviously, such presumption is not conclusive. It may be that in a case like Bullock E. M. Co. v. Lehigh Valley Traction Co., 231 Pa. 129, 80 A. 568, where the building is erected and adapted for one purpose only, and the machinery is built into the building as an essential part of the 'construction necessary in conducting the business for which the structure was erected,' the presumption becomes practically irrebuttable."

These buildings were specially constructed for a grocery warehouse and bakery. The plans and specifications were designed with this end in view, and all the machinery, equipment, and apparatus were particularly adapted and installed to carry out the work and business of a warehouse and bakery, and when installed these fixtures became an "essential part of the construction necessary in conducting the business for which the structure was erected." Under such circumstances, the presumption arises and "becomes practically irrebuttable" that it was the intention of the lessee in putting the chattels into the buildings that they should become a part of the realty. The fact that it was not provided in the lease that these fixtures, whether fast or loose, ordinary chattels or trade fixtures, were to revert to the lessee and be removed at the end of the period, indicates that it was the intention of the parties that they were to become the property of the owner. Under the evidence in this case, the law implies a covenant to that effect. In the Isman Case, the court said: "If it had been the intention, as contended by appellants, that trade fixtures should be an exception with the right to the lessees to remove them at the determination of the lease, the parties would certainly have so stipulated in the contract." So in the case at bar, if it had not been the intention of the parties that these fixtures should become the property of the lessor and remain, they would or should have so stipulated, but they did not.

The covenants of the old lease between the Union Company and the Almar Company was assumed by the Almar Corporation, and its receivers are accordingly bound by them and stand in the position of the original lessee, the Almar Company.

It follows that the decree of the District Court must be reversed, with directions to award the machinery, equipment, and apparatus here involved to the lessor, the Union Company.

(All italicizing is ours.)