## DELZELL et al. v. CENTRAL PUBLIC UTILITY CORPORATION.

### Civ. A. No. 245.

District Court, D. Delaware.

Oct. 7, 1943.

Collier, Collier & Bernard, of Portland, Or., and Charles F. Richards, of Wilmington, Del., for plaintiffs.

Marvel & Morford, of Wilmington, Del., and Duke & Landis, of New York City, for defendant.

KIRKPATRICK, District Judge.

This is an action by trustees under Chapter X of the Bankruptcy Act, 11 U.S.C.A. § 501 et seq., of Portland Electric Power Company (Pepco), to recover from the defendant, Central Public Utility Corporation (Cenpuc) a block of 21,000 shares of stock of Consolidated Electric and Gas Company (Cegco) $6 cumulative preferred, originally owned by Pepco and transferred by it to the defendant on November 26, 1935. The transfer was one of several made by the two corporations on the same day and was in pursuance of an agreement reached at a conference between the president of Pepco, Mr. Griffith, and the president of the defendant, Mr. Knutson, which had taken place in New York City about a year earlier (November 22, 1934). The plaintiffs contend that it was independent of other matters dealt with at the conference and of the other transfers, and that it was either without any consideration or based on an illegal one.

A vast amount of the plaintiffs' evidence was directed to tracing the series of transactions which produced the intricate and complicated corporate interrelationships

which were the subject of the ·conference of November 22, 1934. (See footnote 1). However, the situation as it existed at that date is the only part of the history material here:

Pepco owned 144,606⁴⁸⁄₁₀₀ shares of Cenpuc's preferred stock. Cegco, a subsidiary of Cenpuc, owned 51,414.6 shares of Pepco second preferred. Cenpub (Central Public Service Corp.) and its subsidiary, Cengas (Central Gas and Electric ·Co.), were in reorganization under § 77B, 11 U.S.C.A. § 207, in the United States District Court of Maryland. One of the assets of Cenpub was 175,797¼ voting trust certificates of Pepco. Pepco was a creditor of both the debtor companies upon a million dollar note made by Cengas and indorsed by Cenpub. Pepco's subsidiary, Portland G. E. (Portland General Electric Co.), owned 107,000 first preferred and 20,000 second preferred stock of Cengas. Cenpuc,

the defendant, was by far the largest creditor of Cenpub (about 90 percent).

Pepco was very much interested in acquiring the block of its second preferred stock held by Cegco, and also its voting trust certificates. The second preferred carried voting rights, constituting one-eighth of the outstanding voting shares. While, at that time, the voting rights of the shares represented by the voting trust certificates were exercised by three directors of Pepco, those shares represented practical voting control, and upon termination of the voting trust agreement that control might again pass into the hands of outside interests, thus making possible a repetition of what had been a disastrous period in Pepco's corporate life.

· The situation may be simplified still further by personifying the two groups of corporate interests represented at the meeting, as Mr. Griffith (Pepco and Portland G. E.)

<hr>

[1] Late in 1929 an eastern corporation, Public Utilities Holding Company, acquired as a result of a deliberate purchasing plan sufficient voting stock of Pepco to control that company. The blocks of stock carrying this control were then transferred to Cenpub (Central Public Service Corporation of Maryland). At the end of 1929 and the beginning of 1930 Cenpub exercised its control to increase the number of directors of Pepco and to put on the Board of Pepco seven outside men of a total of fifteen. Three vice-presidents of Cenpub were made vice-presidents of Pepco, two of its attorneys were made assistant secretaries of Pepco, its treasurer and assistant treasurer were made assistant treasurers of Pepco, and in addition, three other easterners apparently identified with the Cenpub interests were made, two of them vice-presidents and one assistant secretary of Pepco. Also three Cenpub officers were placed upon the Executive Committee of four of Pepco.

This control of Pepco by Cenpub lasted about three years, during which time, as a result of manipulations by the eastern interests which I believe it is unnecessary to detail, Pepco became owner of a note for over $1,000,000 made by Cengas (Central Gas and Electric Co., of Delaware), subsidiary of Cenpub, and indorsed by Cenpub. Portland G. E. (Portland General Electric Co.), subsidiary of Pepco, became owner of 107,000 Cengas preferred, and 20,000 Cengas second preferred.

Whatever the character of the relations

of Pepco and Cenpub during these three years, a very substantial change came about on November 1, 1932. On that date a voting trust agreement was created by which a block of 175,797¼ of the common stock of Pepco owned by Cenpub was transferred to voting trustees, and voting trust certificates representing the stock issued to Cenpub. This block although not a majority (there were 400,-000 shares of voting stock outstanding) did carry practical voting control of Pepco. The trustees were Mr. Griffith, who had been president of Pepco nearly 20 years at that time, and two other Oregon men both of whom were undoubtedly enlisted in Pepco's interests and in no way identifiable with Cenpub. Under their direction the Board of Pepco was reorganized and, when the transactions here under consideration transpired, consisted overwhelmingly of old line Pepco men. It is true that Cenpuc, the defendant, was in a large measure successor to Cenpub and probably largely controlled by the same people. However, it had at the time of the transfer no officers or directors in common with Pepco, and there is no reason to believe that there · was any undue influence exercised, one way or another, between the two companies.

There has been no contention that the $1,000,000 note and the stockholdings of Pepco's subsidiary were invalid.

In view of these facts the conduct of Cenpub in relation to Pepco and the manner in which the note and stockholdings arose, need no extended discussion.

and Mr. Knutson (Cenpuc and Cegco), for the entire arrangement was in reality worked out by these two. Mr. Knutson had the block of second preferred stock of Pepco which Mr. Griffith wanted. Mr. Griffith had 144,606$^{48}$/100 shares of Cenpuc preferred which Mr. Knutson wanted. These two blocks of stock could, of course, have been easily exchanged at agreed valuations. However, there remained of 175,797¼ voting trust certificates of Pepco which Mr. Griffith wanted and these were owned by Cenpub which was in reorganization in Maryland. There were also the 160,000 shares of Mr. Knutson's Cegco, owned by Cenpub's subsidiary, Cengas (also in reorganization with it in Maryland), of which stock Mr. Knutson wanted to acquire as much as he could get.

The trading position of each of the two groups of interests thus depended upon which of them could control the disposition of the assets of the companies in reorganization. On the face of it Mr. Griffith could control Cengas and Mr. Knutson Cenpub, through their respective holdings of creditor interest of each.. However, the trustees of Cenpub had recently asserted a claim for $22,000,000 against Cengas. The validity of this claim was not admitted but, if it had been established, it would have reduced Mr. Griffith to a small minority position among the creditors of Cengas and left things largely in the control of Mr. Knutson. Both parties recognized that unless an agreement could be reached the status of the $22,000,000 claim could not be determined except after prolonged and costly litigation. It was also apparent that that matter would have to be settled somehow before the two Maryland companies could be reorganized, and that a plan for reorganization of those companies would have to be worked out before Griffith and Knutson could accomplish what each desired for his own company by way of reacquiring its securities.

The foregoing facts have been cited because they show quite plainly, it seems to me, that the problem of readjustment with which these gentlemen undertook to deal in November 1934 cannot be viewed as a number of distinct and isolated items nor can it be disassociated from the reorganization proceedings in Maryland. The parties had a single common end in view, namely, the unscrambling of the unnecessarily complicated and burdensome interlocking ownership by which each had become vested with large blocks of securities of the other, and agreement upon a reorganization plan for the Maryland companies was a necessary prerequisite to reaching it.

In a very narrow and technical sense, of course, the mutual agreement upon the plan of reorganization might be considered to be separate from the general readjustment of corporate holdings, but even if that view should be adopted (and I do not adopt it) the transfer of 21,000 shares of Cegco clearly would belong with the general readjustment, not with the agreement effecting the reorganization and, for consideration, it was supported by the other transfers to the Griffith Companies of their own securities.

As stated above, the theory upon which the plaintiffs base their claim is that the transfer of the 21,000 shares of Cegco was either, (a) wholly without consideration— a pure gift by Griffith and the directors— and consequently ultra vires, or (b) the price of the defendant's consent to the plan of reorganization (disguised as compensation for services in the resolution authorizing it) undisclosed to the reorganization court and hence unlawful and a fraud upon the Court. Obviously, if the agreement to make the transfer was part of the means by which Pepco obtained valuable assets (its second preferred stock and voting trust certificates) and of the general agreement, then there was a perfectly legal valid consideration, the transfer was not ultra vires, and, being a matter of adjustment of their own affairs by the two corporations involved, did not require disclosure to the Court which was engaged in reorganizing a third company. Even assuming that the law was otherwise and that nondisclosure would have made the transfer, even though supported by valid consideration, illegal, still, if the transaction was all one, the plaintiffs cannot make out a case without disclosing that Pepco is still in possession of the very substantial benefits which it received from the transaction. In such case, whatever the remedy, it would not be a return of the stock to Pepco, leaving it in possession of all the fruits of the deal.

The plaintiffs, for evidence of the separate nature of the agreement to transfer the Cegco shares, rely largely upon an interchange of letters and telegrams between Mr. Griffith and Mr. Knutson in November 1935, and the recitals, in the resolutions transferring and accepting the shares, which apparently were inserted as a result

of this correspondence. The recital of the Pepco resolution is that the transfer was "for services performed for and on behalf of this corporation in the bankruptcy proceedings of Central Public Service Corporation, et al * * *." The Cenpuc resolution accepting the shares is to the same effect.

It must be conceded that, if any regard whatever be paid to the course of dealing between these parties beginning with the agreement of November 22, 1934, and to the circumstances surrounding the transfer and the results which it accomplished, no conclusion can be reached other than that the transfer was simply one term of the original general agreement. Only if the letters and telegrams and the resolutions be taken out of their setting and considered independently of everything that had gone before, can any support for the plaintiffs' theory be drawn from them. The plaintiffs say that the Court must approach the question in exactly this way, and invoke the parol evidence rule.

 Before the parol evidence rule can be applied in any given situation the court must determine the preliminary question whether the documents upon which it is invoked were in fact intended by the parties as an integration of their entire agreement. Regardless of what state law applies (see footnote 2) that is the general principle which underlies the rule and is the law everywhere. This preliminary question is purely one of fact, and for the purposes of determining it all the circumstances of the transaction are relevant and must be considered. So considering them, I find that the letters, telegrams and resolutions in question were not intended to be and did not constitute an integration by the parties of their entire agreement so far as it related to the 21,000 shares. They go no further than to indicate that, for purposes of his own having to do with the relations of the companies which he controlled but not in any way affecting Mr. Knutson's side of the transaction, Mr. Griffith wished to have the 21,000 share transfer appear, as a matter of form, as a separate and independent transaction, and that Mr. Knutson, being interested only to the extent that his corporations were affected, was entirely willing that any form satisfactory to Mr. Griffith should be adopted.

Mr. Griffith testified that the arrangement which resulted in the transfers of November 26, 1935, evolved from a series of agreements beginning November 22, 1934 and ending with the transfers ("The discussion went along * * * like a boy and girl going together and finally getting to an understanding between themselves."). In substance, he testified that the first step in this process was the agreement that Cenpuc would promote and accept the so-called December 1, 1934 Plan of Reorganization in the Maryland court and that Griffith, in return, would see that his interests transferred to Cenpuc 21,000 shares Cegco preferred—an understanding which depended in no way upon agreement upon any other item. The defendant on the other hand contends, and its then president Knutson testifies, that the conference of November 22, 1934 resulted in a unified agreement which comprehended the essentials of all the transfers of November 26, 1935.

Undoubtedly on November 22, 1934, it was Knutson's understanding that the whole matter was settled as to what was to be done. He prepared a typewritten memorandum on that date setting out his conception of the conference, and there is no reason to doubt it in either the fact of its preparation on that day or its accuracy in stating what his conception was.

His recollection of the agreement as so recorded by him corresponds to what was done:

1. The December 1st plan was accepted by the parties, approved by the Court and executed under the Court's order. Under it Cenpuc acquired the voting certificates which had been held by Cenpub; and Pepco acquired 45,000 Cegco $6 cumulative preferred for its million dollar note, and Portland G. E. acquired 53,500 of the same stock for its Cengas first preferred.

2. On November 26, 1935 Cenpuc transferred to the Griffith interests the 51,414.6 Pepco second preferred (which it obtained for that purpose from Cegco) and the 175,-797¼ voting trust certificates. The Griffith interests transferred to Cenpuc 21,000

---

2 No request has been presented raising the question of the applicable state law. I have assumed the law of Delaware as governing. Unless application is made for further hearing and argument upon that point I shall take it that the parties are in agreement that the law of that State is the proper applicable law.

Ccgco $6 cumulative preferred, 144,606⁴⁸/₁₀₀ Cenpuc preferred, 8,387 of the same, 3,634 Cenpub $4 preferred, and 20,000 Cengas second preferred.

Knutson says that the matter of the way in which all this was to be accomplished ("the mechanics") was left in Griffith's hands. (See footnote 3.) Knutson was dealing with Griffith and did not particularly care whence came the stock which he understood was to be the consideration for his company's transfers. Griffith's side of the transaction was more complex. He felt that he was representing a number of interests. (See footnote 4.) It is quite probable that he thought what was left in his hands was not merely the drafting of mechanics but the creation of actual agreements on the basis of a tentative draft.

The essence of the agreement was not changed by Cenpuc's compliance with Griffith's request that the consideration be re-

cited as "services" in the case of the 21,-000 Ccgco preferred and, in the case of the 51,414.6 Pepco Second preferred, $1 and transfer fees. The defendant well points out that it would be a very unlikely situation for two corporations to give simultaneous but unilateral and unrelated gifts of stock. And it is even less likely that, if services had been the actual consideration the parties had in mind, Cenpuc would make an outright gift of the stock that went to Griffith, the 51,414.6 Pepco preferred.

Though Griffith constantly maintained that the 21,000 shares for services phase of the arrangement was separate and distinct, this lack of connection with the other phases of the transaction was not so strong in his mind at the time of the transfers. He wrote to Knutson on November 21, 1935: "There is another step in our adjustment program which was that when

---

3 The plaintiffs say, "No particular 'mechanics' would have been required to transfer the shares to Portland Electric Power Company or Central Public Utility Corporation. It did require 'mechanics' to bury the true nature of the deal between Mr. Griffith and Knutson."

However, both witnesses testified that one reason why the exact method in which the transfers were to be made was left to Mr. Griffith was that he could minimize on the number of transfers and the amount of transfer taxes and fees. They are borne out in this by their correspondence shortly before November 26, 1935. (See P/28–130, P/28–145, P/28–150.) In support of this are the facts that the transfer of the Cenpuc shares to Cenpuc was made specifically for the purpose of cancellation, thus avoiding transfer taxes; and that the voting trust certificates were never actually transferred to Cenpuc, and the Court order allotting them to Cenpuc was taken by the transfer agent as sufficient to give Cenpuc authority to pass them on.

4 What actually happened was as follows:

1. The 51,414.6 Pepco second preferred was transferred directly to Griffith for a recited consideration of $1 and transfer taxes. Griffith then transferred it to trustees who held it under a trust, the proceeds of which were to go to the employees of Pepco and its subsidiary. A number of years later the trust was terminated and the corpus, the Pepco second preferred, went to Pepco.

2. The 175,797 voting certificates were split into two blocks: (a) 165.797 were

transferred by Cenpuc to a lawyer named Nelson who in turn transferred them to Securities Savings and Trust Company to be held in escrow for Pepco until the termination of the voting trust agreement. The recited consideration was the 144,606⁴⁸/₁₀₀ shares of Cenpuc preferred. (b) 10,000 of the voting trust certificates were transferred by Cenpuc to Consolidated Securities Company which also transferred them to Securities Savings and Trust Company in escrow for Pepco and delivered an assignment to Pepco. The recited consideration was 8,387 Cenpuc preferred.

3. The 21,000 Ccgco preferred was transferred to Cenpuc "for services."

Thus the beneficial ownership of all of the shares transferred by Cenpuc went to Pepco.

Exactly what went on in Griffith's mind when he arranged the transfers in this manner is not entirely clear. Some parts of his "mechanics" are explained, however. He did want to set up a trust for the employees, and apparently had the approval of his board though no formal resolution to that effect was adopted. He also wished to prevent the possibility of immediate extinguishment of the voting rights of the shares represented by the voting trust certificates, which might have been the consequence of their becoming treasury shares. It is also to be noted that some of the stock to go to Cenpuc was owned by Consolidated Securities Company, and this is apparently why he had the 10,000 voting trust certificates transferred to it.

CPU (Cenpuc) had complied with the provisions of the two other letters I have written you on this date (setting out the method of transferring the other blocks of stock) that the Portland companies (Pepco) should transfer to CPU as compensation for its services in the reorganization (21,-000) shares of $6.00 preferred stock of Consolidated Electric and Gas Company. * * I am prepared upon consummation of the arrangements covered by my two other letters of this date to direct Central Securities Transfer Company to issue to CPU the said * * * shares of Consolidated preferred. As soon as you advise me that you have forwarded the voting trust certificates and the second preferred stock with the letters of direction and assignments to Security Savings and Trust Company, I shall immediately forward certificate for Consolidated's $6.00 preferred to the Central Securities so that Central Securities will be able to complete the transaction simultaneously with the taking up of the voting trust certificates and second preferred stock here."

The reiterated "when CPU had complied," "upon consummation of the arrangements," "As soon as you advise me," are a good deal stronger in their context than a mere statement of the time when the transfer was to be made, even with the "so that" clause last quoted.

■ It thus appears that the fact necessary to support the plaintiffs' case and upon which their entire contention depends cannot be found in their favor. Upon that point I adopt the defendant's Conclusion of Law C (which is really a finding of fact): "The transfers by defendant to Franklin T. Griffith of 51,414 shares of Pepco second preferred stock and to Earl S. Nelson and to Securities of a total of 175,797¼ shares of Pepco common stock represented by voting trust certificates, the surrender by Pepco and Securities to defendant of a total of 152,991⁴⁸⁄₁₀₀ shares of defendant's preferred stock, and the transfer by Pepco to defendant of 21,000 shares of Cegco preferred stock, were parts of a single transaction involving a trade or exchange of property, which was executed on or about November 27, 1935."

Judgment for the defendant.

### Findings and Conclusions

Each statement of fact made in the foregoing opinion may be taken as a special finding of fact.

The plaintiffs have presented 43 requests for findings of fact and the defendant 66. In addition most of the requests for conclusions of law submitted by the defendant are in reality requests for fact findings and will be treated as such.

I affirm all the defendant's requests for findings of fact except Nos. 57 and 60. I also affirm as fact findings his requests for conclusions of law A, B, C, D, E, F, and the first parts of H and L.

I affirm the plaintiffs' requests for findings of fact Nos. I to XXIX, inclusive, and XXXIV. Many of these duplicate the defendant's requests but some of them set forth documentary evidence which it may be desirable to have in the form of findings. I specifically deny the plaintiffs' requests Nos. XXX, XXXIX, XXXXII and XXXXIII.

I affirm the defendant's requests for conclusions of law I, J, K, and N, and the last parts of H and L.

I affirm the plaintiffs' first and third requests for conclusions of law. The second request need not be answered because the plaintiffs' claim cannot be maintained on the facts. I deny all the plaintiffs' remaining requests for conclusions of law.

■ The rules do not require a specific answer to each request for a finding of fact. It may be taken that such requests as have not been answered have been left unanswered because they are either denied or deemed immaterial or are covered by fact findings otherwise appearing.