**SHANKS VILLAGE COMMITTEE
AGAINST RENT INCREASES
et al. v. CARY et al.**

No. 253, Docket 22339.

United States Court of Appeals
Second Circuit.

Argued April 8, 1952.

Decided June 3, 1952.

Milton M. Carrow and Norman Annenberg, New York City, for plaintiffs-appellants.

Myles J. Lane, U. S. Atty. Southern District of New York, New York City, Earle N. Bishopp, Asst. U. S. Atty. Southern District of New York, Brooklyn, N. Y., of counsel, for defendants-appellees.

Before CHASE, BIGGS and CLARK, Circuit Judges.

BIGGS, Circuit Judge.

The plaintiffs in this case, three hundred and forty-four in number, comprising two hundred families, brought suit against Cary, Shanks Village Housing Manager of the Public Housing Administration, and Kervick, Director of the New York Field Office of the Public Housing Administration, to enjoin them from terminating leases to apartments occupied by plaintiffs in the housing project known as Shanks Village in Orangeburg, Rockland County, in the Southern District of New York; from compelling the plaintiffs to vacate their apartments before midnight on February 29, 1952; and from enforcing a 15% increase in rents. Affidavits and a motion for a temporary restraining order were filed by the plaintiffs, and a temporary restraining order was issued by the court below on February 18, 1952. Thereafter, counter-affidavits having been filed, the matter came on for hearing on February 26, 1952, as to whether or not a temporary injunction should be issued. On March 14, 1952, the court below denied the application for a temporary injunction and vacated the temporary restraining order. Six[1] of the plaintiffs have appealed.

The plaintiffs are citizens of New York, as are the defendants. No jurisdictional amount is alleged. Jurisdiction is not sought to be bottomed upon Section 1331, Section 1332(a), or Section 2201 of Title 28 U.S.C. The plaintiffs contended in the court below and contend here that their cause of action is based on Section 1571, Title 42 U.S.C.A., Section 501, as added to the Lanham Act, which provides, *inter alia,* that " * * * the Administrator shall fix fair rentals for housing constructed or made available pursuant to this subchapter which shall be within the *financial reach*[2] of servicemen and veterans with families." The "Lease Termination Notice" sent by the defendant, Cary, the Housing Manager, to the plaintiffs stated that " * * * increased operating costs require an increase in the rental charges for the dwelling you are presently renting" and that " * * * this rent increase is authorized under the Rent Control Act of 1951."[3] The defendants, however, rely wholly on Section 1544, Title 42 U.S.C.A., incorporated by reference in Section 1571, Title 42 U.S.C.A.[4], which defines the powers of the Administrator of the Federal Public Housing Authority and provides that " * * * the Administrator shall fix fair rentals * * * which shall be based on the *value*[5] [of the projects] as determined by him * * *." The defendants assert that this section is controlling and that therefore the defendant Cary acted pursuant to the mandate of the statute. The plaintiffs also contend that the defendants have violated the contracts for occupancy between them and the National Housing Agency; that by reason of the provisions of paragraph 5(a) of the "Terms and Conditions of Occupancy" the leases adopted the law of the State of New York and that termination of the leases may be effected only pursuant to that law; and, finally, that the plaintiffs are threatened with irreparable injury and have no adequate remedy at law. The defendants deny these contentions and assert that the court below was without jurisdiction to determine the controversy;

1. The plaintiffs who have appealed are Shanks Village Committee against Rent Increases, Hickerson, Martin, McConlogue, Murphy, and Williams.

2. Emphasis added.

3. The Shanks Village project, however, does not come under the jurisdiction of the Office of Rent Stabilization or the Office of the New York State Rent Control.

4. Section 1571, Title 42 U.S.C.A., provides that " * * * the Administrator is authorized to exercise all of the powers specified in subchapters II and IV of this chapter * * *" Section 1544 is a part of subchapter IV.

5. Emphasis added.

that the court did not abuse its discretion in refusing to grant a preliminary injunction; and that the plaintiffs have an adequate remedy at law.

The court below in its opinion did not discuss the question of jurisdiction but assumed that it possessed power to adjudicate the controversy. The court decided that the acts of the officers were in accordance with the statute and that *increased operating costs* [6] afforded a legal basis for the demanded increase; that the fact that of 1,400 tenants of Shanks Village approximately 700 had agreed to pay the increased rental was some evidence that the defendants had " * * * acted reasonably with regard to the standard 'of financial reach;' " that there was doubt as to the applicability of New York law as contended by the plaintiffs; and, finally, that the plaintiffs' remedy at law was adequate for no eviction proceedings had as yet been brought against any of them, but if such should be brought, each plaintiff would have the right to litigate the question "of his particular 'financial reach.' " Finally, the conclusion is implicit in the decision of the court below that if any of the plaintiffs were evicted money damages would afford adequate compensation.

We are of the opinion that the court had jurisdiction to determine the case pursuant to Section 1009(c), Title 5, U.S.C.A., The Administrative Procedure Act, unless the plaintiffs have failed to exhaust their administrative remedy, if any, or the agency action complained of is not "final" within the terms of the Act, or the suit has been brought against persons designated as defendants who do not possess the capacity to be sued, or the plaintiffs are found to have an "adequate remedy in any court." [7]

The legislative history of the provision for veterans in the Lanham Act illuminates the major questions presented for our de-

cision. The Act was intended by Congress, as is clearly demonstrated by its legislative history, to afford to servicemen and veterans cheap but adequate housing. Section 1544, Title 42 U.S.C.A. grants broad general powers to the Housing Administrator with respect to defense housing. This section, incorporated by reference as we have said in Section 1571, provides that " * * * the Administrator shall fix fair rentals" "which shall be based on the value thereof * * *." The Administrator is also authorized " * * * during the emergency, in exceptional cases, to adjust the rent to the income of the persons to be housed * * *." The words quoted came into the law by virtue of the Act of January 21, 1942, c. 14, § 6, 56 Stat. 12, before provision for veterans was made by the Act of June 23, 1945, 59 Stat. 260, 42 U.S.C.A. §§ 1571–1573, and represent a compromise between the views of the Senate and the House of Representatives as to rentals which should be paid by *defense workers and servicemen on duty.* See Vol. 88, Part. I, Congressional Record, 77th Cong., 2nd Sess., page 402, wherein Representative Lanham stated: "As a matter of fact the whole purpose of this Act is to make provision in these congested areas of national defense for the enlisted men of the Army and Navy that may be assigned in that area, and the industrial workers engaged in defense production. To that we have added in this bill Officers of the Army, Navy, or Coast Guard that may be assigned to that defense area." The Senate contended that "financial reach" should constitute the standard for determining the rentals while the House took the position that the amount of the rentals should be based on the "value" of the leaseholds.[8] The statutory compromise quoted above was effected as an amendment to the original provisions of Section 7 of the Lanham Act. See 56 Stat. 12. The Lanham Act, as

---

6. This is the language of the "Lease Termination Notice."

7. The statute provides in pertinent part: "Every agency action made reviewable by statute and every final agency action for which there is *no other adequate remedy in any court* shall be subject to ju-

dicial review * * *." (Emphasis added.)

8. See Vol. 88, Part I, Congressional Record, 77th Cong., 2nd Sess., page 400; Vol. I, House Misc. Repts., 77th Cong., 2nd Sess., House Report No. 1589.

originally enacted, had provided that "* * * the Administrator shall fix fair rentals, on projects developed pursuant to [the Lanham Act], which shall be within the financial reach of persons engaged in national defense * * *." 54 Stat. 1127.

The Act of June 23, 1945, now embodied in Section 1571, Title 42 U.S.C.A., provides in pertinent part that "In those areas or localities where the Administrator shall find that an acute shortage of housing exists or impends and that, because of war restrictions, permanent housing cannot be provided in sufficient quantities when needed, the Administrator is authorized to exercise all of the powers specified in subchapters II and IV of this chapter, subject to all of the limitations upon the exercise of such powers contained in such subchapters, to provide housing for distressed families of servicemen and for veterans and their families who are affected by evictions or other unusual hardships * * *: *Provided*, That any housing constructed under the provisions of this subchapter shall be undertaken only where the need cannot be met by moving existing housing * * *: *And provided further*, That the Administrator shall fix fair rentals for housing constructed or made available pursuant to this subchapter which shall be *within the financial reach of families of servicemen and veterans with families."* [9]

House Rept. No. 651, accompanying H. R. 3322, the Act of June 23, 1945, c. 192, 59 Stat. 260, the Act, which, as we have indicated, added provisions for veterans to the Lanham Act, states as follows: "The necessity for the bill arises from the following two types of housing needs: (a) the distressing situation of families of service men overseas who because of evictions or other causes are deprived of the housing which they have been occupying and cannot find other housing within their means due to the general housing shortage; and (b) the inability of returning veterans

and their families to find places to live * * * In addition, many of the families of servicemen overseas, and even some the returning veterans and their families, cannot afford to purchase new homes at this time nor are their circumstances sufficiently stable to justify such purchases." [10, 11] Representative Lanham stated in respect to the rental provision, "It is also provided in view of the fact that these are distress cases that *these veterans or their families will simply pay a rental that they are able to pay although generally speaking the law calls for an economic rental."* [12]

■ We point out that though the proviso as to "exceptional cases" specified in subchapter IV, Section 1544 is incorporated by reference in Section 1571, the final proviso of Section 1571, reiterating as it does that "rentals * * * shall be within the financial reach of families of servicemen and veterans," makes the test "financial reach" of the veterans rather than "value" of the property to be rented. Our view is confirmed by the words of Representative Lanham quoted and italicized above that veterans were to pay a rental that they were able to pay although generally speaking the law calls for an economic rental.

■ Dealing first with the adequacy of remedy by way of damages in the light of the Lanham Act as amended and its legislative history, we conclude that money damages alone were not considered by Congress as affording an evicted veteran adequate compensation. The Act was intended by Congress, as we have demonstrated, to furnish to servicemen and veterans cheap but adequate housing. The rights of the litigants under the statute therefore must be considered in the light of the favorable · status which Congress intended to give and did give to them. If the plaintiffs are persons properly coming within the purview of the Lanham Act it clearly was *not* the intention of Congress

9. The italics, last occurrence, in the above quoted paragraph are added.

10. Vol. III, House Misc. Repts., 79th Cong., 1st Sess.

11. See also Senate Report No. 369, Vol.

II, Senate Misc. Reports, 79th Cong., 1st Sess.

12. Vol. 91, Part 4, Cong.Rec., 79th Cong., 1st Sess., p. 5512. Emphasis added to the sentence last quoted.

to permit them to be ejected and to compel them thereafter to ameliorate higher rentals required to be paid by them outside the housing project by actions at law, perhaps repeatedly brought, to obtain money damages. Congress was of the view that the veteran's rent should be adjusted to his income and that this was a matter to be determined in the light of all the circumstances affecting his situation including his income. In other words, the right of a veteran to continue to occupy a Shanks Village apartment is a property right of peculiar intrinsic value and in our opinion falls by analogy within the principle enunciated in such cases as Cushman v. Thayer Mfg. Jewelry Co., 76 N.Y. 365, 32 Am.Rep. 315; Raftery v. World Film Corp., 180 App.Div. 475, 167 N.Y.S. 1027; and Phillips v. Hilmont Realty Corp., 195 Misc. 270, 91 N.Y.S.2d 418. These cases hold that he who is entitled to a chattel or service of peculiar value may have specific performance and cannot be forced to seek recompense by way of damages in an action at law.

■ As to the ruling of the court below that the acts of the officers of Shanks Village were in accordance with the statute, we again must disagree. The court found that "increased operating costs" afforded a legal basis for the 15% increase demanded but added that because approximately 50% of the tenants had accepted the raise without objection this was some evidence that the officers had acted reasonably

with regard to the standard of "financial reach." As legislative history demonstrates the sole test is the "financial reach" of the veteran and since the court below did not apply this test. it was in error.[13]

■ Next we conclude that the court below also erred in stating that there was "substantial doubt" as to whether or not the plaintiffs' leases could be terminated only in accordance with "the New York rent law" as contended by the plaintiffs. Section 1522, Title 42 U.S.C.A., incorporated by reference in Section 1571, Title 42 U.S.C.A., since it is a part of subchapter II, provides that " * * * proceedings for the recovery of possession of any property or project developed or constructed under this subchapter shall be brought by the Administrator in the courts of the States having jurisdiction of such causes and the laws of the States shall be applicable thereto." In reaching its conclusion the court below laid emphasis on Section 8582(e), 65 McK.Unconsolidated Laws, Part 2, which provides that housing accommodations owned by the United States are not subject to rent control. But the issue here is one of termination of the plaintiffs' leases and not one of rent control. The "Terms and Conditions of Occupancy" provides, paragraph 5, "Termination of Occupancy," "The FPHA may terminate occupancy by giving advance notice in writing under * * * [stated] conditions * * *." The numerous conditions, set out in the footnote,[14] follow.

---

13. In this connection and in further support of our ruling we point out that paragraph 7, "Information Required by the FPHA," of the "Terms and Conditions of Occupancy," provides as follows:

"The occupants shall submit to the FPHA, upon request, signed statements setting forth the pertinent facts concerning the occupant's household composition, employment status, and family income. FPHA may reexamine such information periodically for the purpose of determining whether the occupant has the right to continue to occupy the dwelling."

This provision would seem to be meaningless if the action of the Shanks Village Manager and the Director of the New York field office of the Public Housing Administration in basing the increase

of rent on "increased operating costs" is correct.

14. The conditions are as follows: "a. If the occupant fails to pay rent or other charges when due; if the occupant does not comply with all of the Terms; if the occupant misrepresents facts required by Section 7; if neither the occupant nor any member of the family is a certified war worker; if FPHA closes all or part of project; if other accommodations suitable to the occupant are available in other parts of the project or in other projects which are to continue in occupancy under the FPHA and the FPHA offers the occupant an opportunity to use such accommodations at the established charges. The occupant agrees to accept as sufficient service any notice delivered

Insofar as appears from the record none of these conditions has been breached by the plaintiffs.

█ The court below also erred in holding in effect that the plaintiffs' suit was premature saying [103 F.Supp. 566, 568]: "If they [the defendants] should subsequently initiate eviction proceedings each of the plaintiffs would have the right to test defendants' action to litigate the question of his particular 'financial reach'." We are compelled to disagree with this view. The official letter of January 25, 1952, entitled "Lease Termination Notice," sent by the defendant Cary, the Housing Manager, to each of the plaintiffs,[15] is the equivalent of an eviction notice. The next step to be taken on behalf of the United States by the defendants or others would be eviction proceedings against the plaintiffs or some of them.

Could one of the plaintiffs, in view of the "Lease Termination Notice", demanding increased rentals, issued by the Housing and Home Finance Agency, Public Housing Administration, and the presumption of regularity which inheres in such a ruling, valid on its face and rendered in due course by an administrative agency of the United States, successfully assert in a court of New York State that the rent about to be exacted of him was not within his "financial reach"? In United States v. Chemical Foundation, 272 U.S. 1, at pages 14–15, 47 S.Ct. 1, 6, 71 L.Ed. 131,[16] the Supreme Court of the United States by Mr. Justice Butler stated, "The presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." The ruling of the Housing and Home Financing Agency establishing the 15% increase was arrived at by a process of fact-finding, valid on its face, though erroneous in law as we have demonstrated. Under these circumstances we conceive that a

New York State court would scarcely permit the plaintiffs or any of them to maintain the defense that the Housing and Home Financing Agency's order put their rentals beyond their "financial reach."

At the very least a New York State court would take the position that the ruling on rent increase by the Housing and Home Finance Agency was entitled to great weight. See Sherry Netherland Corp. v. Mandel, 181 Misc. 372, 46 N.Y.S. 2d 734; 816 Fifth Avenue v. Leonard, 188 Misc. 728, 67 N.Y.S.2d 386, affirmed 188 Misc. 866, 73 N.Y.S.2d 486. This would be an effective application of the doctrine of comity. Collateral attack on the validity of the ruling of the Housing and Home Finance Agency would not be permitted, for if recourse were had to a New York State court on the equity side to enjoin ejectment proceedings the court would rule that the Housing and Home Finance Agency, Public Housing Administration, was a federal agency and as such was immune from suit in a State court. Goldstein v. Sommervell, 170 Misc. 602, 10 N.Y.S.2d 747; Manufacturers Trust Co. v. Ross, 252 App.Div. 292, 299 N.Y.S. 398. See also Parry v. Delaney, 310 Mass. 107, 37 N.E.2d 249; United States v. Owlett, D.C.M.D.Pa., 15 F.Supp. 736.

Quite aside from the considerations suggested in the preceding two paragraphs it is obvious that the determination of an individual veteran's "financial reach" is one which lies within the peculiar competence of an administrative agency and is a question of administration and administrative law. Resolution of such a question does not rest within the competency of a court, for every factor of the veteran's financial condition would be pertinent. A court acting within its proper ambit, could determine only whether the administrative agency had acted pursuant to law and within the scope of its authority. It follows therefore that if, as we think we have

---

personally, affixed to the door of the premises, or mailed to the premises. If the FPHA terminates occupancy it shall have the right to reenter and take possession of the premises and remove all persons and property."

15. See "Exhibit B" of the complaint.

16. See also United States ex rel. Adamantides v. Neelly, 7 Cir., 191 F.2d 997, 999. Cf. I. C. C. v. Railway Labor Executives Ass'n, 315 U.S. 373, 380, 62 S.Ct. 717, 86 L.Ed. 904.

demonstrated, the Housing and Home Finance Agency has not acted in accordance with the legal standards imposed on it by Congress by the Lanham Act, the correction of the standard applied by the Housing and Home Finance Agency lies within the province of a court of the United States. It was precisely such a situation as this as was envisaged by Congress when it enacted The Administrative Procedure Act.

The court below did not determine whether or not the suit could be maintained against the defendants; that is to say, whether they had, or did not have, the capacity to be sued. From the affidavit filed by Kervick a chain of authority would seem to have been established from the Housing and Home Finance Agency to the Public Housing Administration, through the Administrator to the Commissioner of Public Housing Administration and from the Commissioner to the Field Office Directors, of whom Kervick is one. It appears that the Commissioner in November 1951 directed all Field Office Directors to raise rents in veterans housing by 20% because rentals for comparable housing generally had risen 20% above the maximum rents in effect on January 30, 1947. It further appears that Kervick, as Field Office Director, had the right to determine "after study" the degree of rent increase which should be imposed upon the tenants of Shanks Village (not, however, exceeding 20%) and did so.[17] What we have just said is not intended to be determinative of the issue as to Kervick's or Cary's capacity to be sued. This must be determined by the court below upon sufficient evidence and with appropriate findings.

The plaintiffs cannot maintain their suit unless they have exhausted their administrative remedies and unless the agency action is "final". See Natural Gas Pipeline Co. v. Slattery, 302 U.S. 300, 311, 58 S.Ct. 199, 82 L.Ed. 276. There is no allegation in the complaint that the plaintiffs have exhausted their administrative remedies or that the agency action was indeed final. Such allegations may be supplied by appropriate amendment, if the court below should see fit to grant leave to file it, but whether or not the plaintiffs have exhausted their administrative remedies and the final nature of agency action must be determined *ab initio* by the court below.

We do not hold that the court below abused its discretion in denying the temporary injunction for in our view the court did not reach a point where legal discretion properly could be applied. We state this because the court below did not employ the correct standard of law. For this reason the order appealed from will be vacated and the cause will be remanded with the direction to reinstate the restraining order and, supplementing the record if such a course should be necessary, to pass again upon the application for a temporary injunction in the light of this opinion.

The order appealed from is vacated and the cause is remanded.

---

17. See paragraphs 8, 9, and 10 of the Kervick affidavit.