**WOODLANDS CEMETERY CO. v. UNITED STATES.**

Civ. No. 8449.

United States District Court
E. D. Pennsylvania.

March 4, 1953.

Bertram G. Frazier, B. Graeme Frazier, Jr., and Philip Price (of Barnes, Dechert, Price, Myers & Rhoads), Philadelphia, Pa., for plaintiff.

Gerald A. Gleeson, U. S. Atty., Philadelphia, Pa., C. James Todaro, Sp. Asst. to Atty. Gen., Robert R. MacLeod, Atty., Dept. of Justice, Washington, D. C., for defendant.

FOLLMER, District Judge.

Defendant, the United States of America, filed a motion for a new trial following a jury verdict for the plaintiff in the sum of $580,000. Plaintiff, the Woodlands Cemetery Company, was the owner of 14.-7841 acres, or approximately 643,995 square feet, of land situated at the southwest corner of Woodland and University Avenues in the City of Philadelphia. This land was acquired by condemnation proceedings by the United States of America for public use. The issue at the trial was the value of the land at the time of the taking on May 3, 1948.

Aside from the purely formal and routine reasons assigned for a new trial, the only specific reasons assigned by defendant are No. 1 relating to the size of the verdict, to wit:

"1. The verdict is grossly excessive."

and Nos. 5 and 6 relating to the granting of a view, to wit:

"5. The Court erred in entering an Order permitting the Jury to view the property after a lapse of four and one-half years from the date of tak-

ing, and after it had been totally im- proved and embellished by its adaptation to the Government's special use and bore no resemblance whatsoever to the condition of the land at the time of taking.

"6. The view by the Jury was misleading and prejudicial and resulted in a valuation of the land as adapted to the special use of the Government rather than a valuation of the property in its condition at the time of taking."

As to the amount of the verdict. The jury had the benefit of the appraisals of six real estate experts. The four called by the plaintiff testified to values, as of the date of the taking, ranging from $625,000 or at the rate of approximately 97¢ per square foot to $680,000 or approximately $1.09 per square foot. The two called by the defendant testified to values, as of the date of the taking, ranging from $236,500 or at the rate of .366¢ per square foot to $245,000 or at the rate of 38¢ per square foot. As above indicated, the jury returned a verdict of $580,000.

■■ While one cannot help but wonder what is wrong with a system of appraising that permits of a spread from .366¢ per square foot to $1.09 per square foot, and what might have been the result if the jury had had the benefit of an appraisal by fully qualified and accredited appraisers appointed by the Court, the fact remains that the jury made its factual determination of valuation after having heard in great detail the qualifications of the respective appraisers, saw and heard them on the witness stand, and after having been carefully and adequately instructed by the Court that they were the sole judges not only of the facts but of the credibility of witnesses. Their verdict is the best answer to their understanding and evaluation of the facts and their appraisal of the appraisers. Their verdict is well within the limits of the testimony of the experts and should not be disturbed by the Court. Any reduction in the amount of the verdict could only be done on the basis that the verdict is large. The law does not provide for a thirteenth juror in the sense that the Court is invited to sit in on the jury's deliberations. Obviously the land here in question is valuable land by any one's measuring stick. The jury has spoken and its verdict, which was supported by substantial evidence, must stand.[1]

■■ As to the view. The matter of permitting the jury to view the premises in question was discussed at a pre-trial conference. The Court indicated that in its judgment a view would be helpful to the jury, after, of course, instruction that while the condition of the land had substantially changed since the taking by the Government that it should be viewed as of the date of the taking. The Court recalls of no formal objection to the view by the defendant and the record discloses none. Subsequently, at the suggestion of the Court, counsel for plaintiff and counsel for defendant agreed upon the route that the jury should follow on its viewing trip. Defendant's counsel submitted no points for charge concerning the view.

There can be no question that the jury was fully and completely informed as to the condition of the property at the time of the taking. They had before them a contour map of the property as it then existed which was fully explained to them by defendant's witness, Cronin, a Government engineer. They also had a large scale model of the entire area taken, showing its contours, the ravine, creek, trees, etc., which was fully explained to them by Cronin and Eichbaum, the man who had supervised the preparation of the model; they also had the testimony relating to the amount of fill that was required for its development. As a matter of fact, defendant's brief contained the following statement,

"In the case at bar there was a wealth of uncontradicted testimony as

1. Foster v. United States, 8 Cir., 1944, 145 F.2d 873; United States v. Certain Lands in City of Newark, N. J. etc., 3 Cir., 1950, 183 F.2d 320; United States v. Hayes, 9 Cir., 1949, 172 F.2d 677; Atwater Kent Mfg. Co. v. United States, D.C. E.D.Pa., 53 F.Supp. 472; City of Philadelphia v. United States, D.C.E.D.Pa., 53 F.Supp. 492.

to the topography of the land, engineering and physical data, which together with the scale model, produced by the Government, admittedly portraying the topography of the subject land, vividly and graphically established the condition of the subject land at the time of taking."

In addition, before going on the view, the Court instructed the jury as follows:

"Members of the Jury, let me call this to your attention: Try to visualize this thing as of 1948. You will understand, of course, that there have been a lot of changes made. Incidentally, there is a hospital on the site that you will see, and for that reason it isn't exactly what you would have seen before. In fairness to everybody concerned you will try to visualize it as you see it on that plot there. It was a rough piece of ground in 1948, very different from what you will see now, I suppose. It is a magnificent hospital now. All of those things you have to take into consideration."

There is not the slightest doubt in my mind that the jury had a very vivid picture of this land as of the time of the taking, and I am also very firmly of the opinion that the jury were in a much better position to properly evaluate the property after having seen it with its own surroundings. Judge McGranery granted a view in the first trial and I would certainly grant it to-day if I had to do it again, it being a matter within the judicial discretion of the Court. I was then, and still am, of the opinion, in view of the great disparity in the testimony of the two sets of experts as to the value of the land, that the jury would have been in no position to properly evaluate the estimates of the experts without personally viewing the land, its location and surroundings, and the location and surroundings of so-called comparable sales. Unquestionably, the jury were impressed by the fact that this property was more closely adjacent to the highly developed holdings of the University of Pennsylvania than to the near slum area "on the other side of the track." But why not? That is where the land lay and it seemed to me the jury were entitled to know it.

The jury were, I feel, adequately advised that the property had undergone substantial change and that they were to visualize it as it was at the time of the taking. They were aided in this regard by the contour map and model. They had to guess as to the surroundings and the neighborhood and it is chiefly in this regard that I feel the view formed a valuable aid.[2]

Defendant's motion for a new trial will be denied.

---

2.  Forbes v. United States, 5 Cir., 268 F. 273; Zug v. City of Pittsburgh, 194 Pa. 367, 370, 45 A. 61.