UNITED STATES of America, Plaintiff,

v.

15.3 ACRES OF LAND, more or less, situate IN THE CITY OF SCRANTON, County of Lackawanna, and Commonwealth of PENNSYLVANIA, and Delaware, Lackawanna and Western Railroad Company, et al., Defendants.

Civ. A. No. 5051.

United States District Court
M. D. Pennsylvania.

Aug. 15, 1957.

See also, D.C., 17 F.R.D. 337.

Harry T. Dolan, Brooklyn, N. Y., J. Julius Levy, U. S. Atty., Scranton, Pa., for plaintiff.

Rowland L. Davis, Jr., New York City, Walter L. Hill, Jr. and Joseph C. Kreder (of Warren, Hill, Henkelman & McMenamin), Scranton, Pa., for Delaware, L. & W. R. Co.

JOHN W. MURPHY, Chief Judge.

The issue is just compensation to defendant for the taking by the United States for military purposes of possession and title to 15.3 acres of land, underlying coal and minerals,[1] four major buildings with a gross floor area of 450,310 sq. ft., overhead cranes and other improvements.[2] Upon defendant's application the estimated amount, deposited in the court's registry, $860,000, was paid on account.[3] The issue of just compensation, over government objection, was referred to a commission (United States v. 15.3 Acres of Land, etc., D.C., 17 F.R.D. 337; F.R.C.P. Rule 71A (h)), consisting of a coal operator; a civil engineer, and a lawyer of mature years, each an outstanding citizen of business experience, unquestioned ability and integrity. After extensive hearings,[4] a view and inspection of the premises, the commission heard arguments, considered briefs, and, after study and deliberation, made findings of fact and conclusions of law; filed a transcript of the proceedings, 477 pp. and exhibits, and a comprehensive report concluding that just compensation should be $1,720,700. The government contends the amount is too large; the Railroad that it is too small; the government that it should be rejected, a new hearing order-

---

1. As to the "third estate", see Smith v. Glen Alden Coal Co., 1943, 347 Pa. 290, at page 304, 32 A.2d 227.

2. Fed.Rules Civ.Proc. Rule 71A(c), 28 U. S.C.A.; Jurisdiction, 28 U.S.C.A. § 1358; Venue, Id., § 1403; Authority, Act Aug. 1, 1888, c. 728, § 1, 25 Stat. 357 as amended and supplemented, 40 U.S.C.A. § 257; August 18, 1890, c. 797, § 1, 26 Stat. 316, July 2, 1917, c. 35, 40 Stat. 241, Apr. 11, 1918, c. 51, 40 Stat. 518, July 26, 1947, c. 343, Tit. II, § 205 (a), 61 Stat. 501, 50 U.S.C.A. § 171; Act July 17, 1953, c. 221, §§ 1-3, 67 Stat. 177-178, 50 U.S.C.A.Appendix §§ 1173-1175; Act Aug. 1, 1953, Pub.Law

179, c. 305, 83d Cong. 67 Stat. 336 (and see Act Aug. 10, 1956, c. 1041, § 53, 70A Stat. 641 and 10 U.S.C.A. Armed Forces, § 2663); Taking Act Feb. 26, 1931, c. 307, §§ 1-5, 46 Stat. 1421, 40 U. S.C.A. §§ 258a-258e; F.R.C.P. Rule 71A (j).

3. 40 U.S.C.A. § 258a (5); F.R.C.P. Rule 71A(j); United States v. Miller, 1943, 317 U.S. 369, at page 381, 63 S.Ct. 276, 87 L.Ed. 336, 147 A.L.R. 55.

4. Power and Proceedings, Rules 71A(h), 53(c) (d) (1) and (2); United States v. Waymire, 10 Cir., 1953, 202 F.2d 550, at page 553.

ed, or the award modified; the Railroad that it should be $2,250,000.

We must accept the findings of fact unless clearly erroneous, Rule 53 (e) (2); Anderson v. Mt. Clemens Pottery Co., 1946, 328 U.S. 680, at page 689, 66 S.Ct. 1187, 90 L.Ed. 1515, and see Rule 52(a), making allowances for the advantages possessed by the commission in appraising the significance of conflicting testimony. Graver Tank & Mfg. Co., Inc., v. Linde Air Products Co., 1949, 336 U.S. 271, at pages 274–275, 69 S.Ct. 535, 93 L.Ed. 672. " 'A finding is "clearly erroneous" when although there is evidence to support it, the * * * court on the entire evidence is left with a definite and firm conviction that a mistake has been committed.' United States v. United States Gypsum Co., 333 U.S. 364 [at page] 395, 68 S.Ct. 525, 542, 92 L.Ed. 746." United States v. Oregon State Medical Society, 1952, 343 U.S. 326, at page 339, 72 S.Ct. 690, at page 698, 96 L.Ed. 978; Hardt v. Heller Bros. Co., 3 Cir., 1948, 171 F.2d 644, at page 648. We may not refuse to recognize findings or escape the conclusions to which they lead merely because of differences in personal persuasion on the evidence or dissatisfaction with the result reached. Ferroline Corp. v. General Aniline & Film Corp., 7 Cir., 1953, 207 F.2d 912, at page 920; United States v. Yellow Cab Co., 1949, 338 U.S. 338, at pages 341–342, 70 S.Ct. 177, 94 L.Ed. 150.

Obviously this is not an invitation to abdicate the judicial function. Krinsley v. United Artists Corp., 7 Cir., 1955, 225 F.2d 579, at page 583. The purpose of a finding of fact is to distill from the evidence the pertinent facts to which relevant rules of law may be applied. Hartford-Empire Co. v. Shawkee Mfg. Co., 3 Cir., 1944, 147 F.2d 532, at page 535. Speculation cannot be substituted for proof. The requirement is for probative facts capable of supporting with reason the conclusions expressed. In re Leichter, 3 Cir., 1952, 197 F.2d 955, at page 957, and see Baumgartner v.

United States, 1944, 322 U.S. 665, at pages 670–671, 64 S.Ct. 1240, 88 L.Ed. 1525.

Upon review it is the duty of the court to accept the award of the commission unless it is clearly erroneous in whole or in part because based upon substantial error in the proceedings, a misapplication of controlling law, or because it is unsupported by substantial evidence or contrary to the clear weight of the evidence. United States v. Waymire, supra, 202 F.2d at pages 553–554. A conclusion of law must have a proper legal basis. Busser v. United States, 3 Cir., 1942, 130 F.2d 537, at page 539; Duquesne Club v. Bell, 3 Cir., 1942, 127 F.2d 363, at page 365, 143 A.L.R. 1377. Likewise as to the mixed question of law and fact. Campbell Soup Co. v. Wentz, 3 Cir., 1948, 172 F.2d 80, at page 82. Where an improper legal theory is adopted, see United States v. 44.00 Acres of Land, etc., 2 Cir., 1956, 234 F.2d 410, at page 414. Interpretations of written documents do not have presumptive validity. Eddy v. Prudence Bonds Corp., 2 Cir., 1947, 165 F.2d 157, at page 163.

The burden of showing a finding of fact is clearly erroneous is on the one attacking it. Grace Bros. v. C. I. R., 9 Cir., 1949, 173 F.2d 170, at page 174. It is especially strong where the question is one of credibility; lighter as to logical inferences drawn from undisputed facts or documents. Where an ultimate fact is simply the result reached by processes of reasoning from, or the interpretation of legal significance of evidentiary facts, it is subject to review apart from impact of rule. Galena Oaks Corp. v. Scofield, 5 Cir., 1954, 218 F.2d 217, at page 219, and see Lehmann v. Acheson, 3 Cir., 1953, 206 F.2d 592, at page 594.

A specific answer to each request is not required. Delzell v. Central Public Utility Corp., D.C.Del., 56 F.Supp. 25, at page 30. The request may have been denied, deemed immaterial, or covered by other findings. Cf. Cohen v. Globe Indemnity Co., D.C.E.D.Pa.1941, 48 F.

Supp. 1, at page 2. The ultimate test is whether the findings are sufficiently comprehensive and pertinent to the issues to provide a basis for decision, and whether they are supported by the evidence. Schilling v. Schwitzer-Cummins Co., 1944, 79 U.S.App.D.C. 20, 142 F.2d 82, at pages 83–84, and see United States v. Certain Parcels of Land, etc., 3 Cir., 1954, 215 F.2d 140, at page 145.

■ After hearing, a review, consideration and study of the whole record, the briefs and arguments, we have concluded that the hearings were fairly, competently and impartially conducted;[5] that they are free from error; that the award is supported by substantial evidence; that it is within the range of the expert testimony, and that it should be adopted and followed. F.R.C.P. Rules 71A(h), 53(e) (2); D. M. W. Contracting Co. v. Stolz, 1946, 81 U.S.App.D.C. 334, 158 F.2d 405, at page 407; In re Mifflin Chemical Corp., 3 Cir., 1941, 123 F.2d 311, at page 313; United States v. Certain Parcels of Land, supra, 215 F.2d at page 146; United States v. Waymire, supra, 202 F.2d at page 553; 5 Moore's Federal Practice, 2d Ed., § 53.12.

One of the principal areas of controversy involves a lease of the entire property by the Railroad to United States Hoffman Machinery Corporation, a private Delaware corporation, for manufacturing heavy ordnance, or other heavy manufacturing. Available for conversion, lease or sale because of a recent change to diesel engines, the lease signed by the president of each corporation was for a fifteen month period, January 1, 1953–April 14, 1954, for $500,000 for the term payable monthly in periodically increased amounts, subject to renewal for four successive terms of one year each at a yearly rental of $400,000 payable in monthly installments.[6]

Since Hoffman was to operate in the manufacture of ordnance under a government facilities and a supply contract, the form of lease had to be approved by the Contracting Officer of the United States Army Ordnance Department. Prerequisite to such approval the Railroad was required to grant an option to the Army to purchase the premises for $2,000,000, exercisable not earlier than 13 months nor later than 19 months after commencement of the original term. Hoffman entered into possession and commenced manufacturing. At the end of the original term the first renewal for one year was executed. The Army did not exercise its option but shortly thereafter while the lease was in effect took title in these proceedings.[7]

Hoffman, taking the premises as it found them, had the right at its sole cost

---

5. On several occasions—only once as to the government, N.T. 474—upon objection to relevancy or materiality, testimony was received and ruling reserved. Anglo California Nat. Bank of San Francisco v. Lazard, 9 Cir., 1939, 106 F.2d 693, at page 705; United States v. Stoehr, D.C.M.D.Pa.1951, 100 F.Supp. 143, at pages 154, 159, affirmed 3 Cir., 1952, 196 F.2d 276, 33 A.L.R.2d 836. In most instances the matter was cleared up by later testimony and the rule of law applied by the commission. At the conclusion of the hearing all objections were overruled. The government points to no evidence of unfairness. If there was any error it was harmless. F.R. C.P. Rule 61.

6. Plus taxes, all charges for utilities, and to insure the buildings for $1,000,000 payable to lessor. The Railroad made

no warranty or representation, and there can be none implied, as to the condition of the premises or suitability for intended use. See Solomon v. Neisner Bros., D.C.M.D.Pa.1950, 93 F.Supp. 310, at pages 314, 315, affirmed 3 Cir., 1951, 187 F.2d 735; Richard Paul, Inc., v. Union Improvement Co., D.C.Del.1945, 59 F.Supp. 252, at page 255; Sheets v. Selden, 1868, 7 Wall. 416, at page 423, 74 U.S. 416, at page 423, 19 L.Ed. 166; 32 Am.Jur. Landlord and Tenant, § 657.

7. The lease thereby terminated. Art. XIV provided that lessee's claim was limited to compensation for its machinery and fixtures; all other claims being assigned to lessor. See and cf. United States v. Petty Motor Co., 1946, 327 U.S. 372, at pages 375–376, 66 S.Ct. 596, 90 L.Ed. 729.

and expense to remodel and renovate,[8] to adapt the premises to its use. It agreed to keep and maintain the premises in good order and condition; make all necessary repairs and painting, and to vacate and surrender the premises in good order, condition and repair (reasonable wear and tear excepted), removing such as the Railroad may direct of all property placed, installed or constructed upon, or affixed to the premises.[9] As to government property affixed to or incorporated in the premises, it was agreed that title was not to be affected; such property was not to become a fixture or lose its identity as personalty.[10] Hoffman agreed to remove it and, if any structural damage to the premises occurred in doing so, to repair and put them into substantially the same condition existing prior to the installation, reasonable wear and tear excepted, or in equally good and serviceable condition.

To rehabilitate and adapt the premises Hoffman, through Consolidated Engineering Company of Baltimore or its subcontractors, made certain repairs, installations and improvements [11] to the buildings and property, which in the opinion of the commission became and formed such an integral part thereof that it would be wholly unreasonable to suppose that any one ever contemplated such permanent improvements, changes and alterations would under any circumstances be ripped out or removed when the lease was terminated; further, that in many instances it would be impossible to do so, and in all instances it would cost far more than the improvements or restoration themselves. Contemporaneous with the renewal of the lease for one year the Railroad, reserving all its other rights, wrote Hoffman waiving and relinquishing its right to removal of these items upon termination of the lease.

Certain buildings and structures were added.[12] All of the items included in Note 12 were considered by the commission as belonging to Hoffman [13] and were

8. As authorized Hoffman razed three frame buildings; structural changes subject to Railroad approval.

9. Failing therein after notice given the lessor could effect such removal and convert the property to its own use. There were the usual provisions as to default, art. XV, remedies in case of termination, art. XVI, XXV, other than by exercise of the option, art. XXVIII. If the government exercised its option to purchase, lessor had the right to reenter and remove all property except that owned by the government, and to hold the premises as if the lease had not been made.

10. "Title to property furnished Lessee by the United States government shall not be affected by the incorporation or attachment thereof in or to the demised premises, nor shall such property, or any part thereof, be or become a fixture or lose its identity as personalty by reason of affixation to the demised premises." Art. XVI. As to removal and restoration, see Art. XXIX.

11. Such as new roofs; toilet facilities; heating system; concrete floors; repair of brick work; changes in railroad tracks; removed and replaced some windows; repaired and installed gas and water lines; removed and replaced doors; removed transfer table and other tracks; filled in pits; changed and repaired tracks; reinforced and added to some subway and basement supports; bricked up door openings; replaced some copings; did patch work on some areas; replaced an elevator; washed, steam-cleaned, sandblasted and painted some buildings; filled, graded and surfaced some areas with blacktop, in part to provide parking facilities; installed additional mezzanine floor space.

12. Billet stands, four oil tanks, oil tank farm, serge tanks, electrical transformer tower, gate house, pump house, chip crusher and chip bins, dust collectors, exhaust fans, one fire escape, conveyor between two buildings, certain unmarked structures, 110 yard crane, two–15 ton cranes (replacement); an entirely new main substation, 21 unit substations and main switchboard with entire new lighting system and power system.

13. Or in all likelihood the government. While there was evidence that Hoffman was reimbursed, there was nothing to show whether or not the government thereby acquired title. Was making available such items to Hoffman a part of the consideration in fixing the price for ordnance?

excluded from the commission's calculations in arriving at just compensation.

Relying upon one phase of United States v. 5 Parcels of Land in Harris County, Texas, 5 Cir., 1950, 180 F.2d 75, where it was assumed for the purpose of argument, the government argues that while Hoffman was the nominal lessee, in view of the provision for reimbursement in the facilities contract, the option, and the possibility of condemnation, the government was practically in possession of the premises since January 15, 1953, and that the owner was not entitled to any enhancement in value so far as the physical condition of the premises was concerned after that date. We disagree. As Mr. Justice Holmes observed, " * * * The law as to leases is not a matter of logic in vacuo; it is a matter of history * * *." Gardiner v. Wm. S. Butler & Co., 1918, 245 U.S. 603, at page 605, 38 S.Ct. 214, 62 L.Ed. 505. The one asserting agency has the burden of proving it. Shay v. Schrink, 1939, 335 Pa. 94, at page 97, 6 A.2d 522. Its existence is not to be presumed merely because it is asserted. Gasner v. Pierce, 1926, 286 Pa. 529, at page 533, 134 A. 494. To constitute the relationship of landlord and tenant these elements must be present: Permission or consent on the part of the landlord, subordination to the landlord's title and rights on the part of the tenant, a reversion in the landlord, an estate in the tenant, and the transfer of possession and control of the premises to the tenant under a contract either express or implied between the parties. Coggins v. Gregorio, 10 Cir., 1938, 97 F.2d 948, at page 950. The relation cannot exist without such contract. In re Wilson's Estate, 1944, 349 Pa. 646, at page 649, 37 A.2d 709. " 'A contract cannot arise by implication of law under circumstances the occurrence of which neither of the parties ever had in contemplation'." Carpenter v. United States, 1873, 17 Wall. 489, at pages 493, 494, 84 U.S. 489, at pages 493, 494, 21 L.Ed. 680.

The tenant takes exclusive possession of the premises, all his rights being subordinated to the primary right of the fee of the owner, and subject to the reversion to him at the end of the term or on termination of the lease. United States v. Richfield Oil Corp., D.C.S.D.Cal. 1951, 99 F.Supp. 280, at page 288, affirmed, 1952, 343 U.S. 922, 72 S.Ct. 665, 96 L.Ed. 1334. As to the reversion, see State of Washington v. United States, 9 Cir., 1936, 87 F.2d 421, at page 430; 32 Am.Jur. Landlord and Tenant, § 76; 51 C.J.S. Landlord and Tenant § 256.

The option to purchase was in the nature of a continuing offer to sell. Willard v. Tayloe, 1869, 8 Wall. 557, at page 564, 75 U.S. 557, at page 564, 19 L.Ed. 501; United States v. Hayman, 7 Cir., 1940, 115 F.2d 599, at page 601; Central Nebraska Public Power & Irr. Dist. v. Harrison, 8 Cir., 1942, 127 F.2d 588, at page 593; Atlantic Greyhound Corp. v. Smithdeal, 4 Cir., 1951, 192 F.2d 453, at page 457. So long as the option remained dormant the lease was in full operation and effect with all the incidents and implied obligations of the landlord-tenant relationship. 32 Am.Jur. Landlord and Tenant, § 300; 51 C.J.S. Landlord and Tenant § 81(b).

In this, as in any other case of a written contract, those who are parties to and bound by it are to be ascertained by an inspection of the instrument; its provisions are controlling in the absence of some positive rule of law or provision of statute requiring them to be disregarded. United States v. Algoma Lumber Co., 1939, 305 U.S. 415, 421–422, 59 S.Ct. 267, 83 L.Ed. 260.

Neither the United States or any officer purporting to act on its behalf is named a party to the lease. While there is testimony that the facilities and supply contracts [14] provided for a measure of control and supervision of Hoffman activities, neither the reservation nor the exercise of that power gave Hoffman the status of agent of the government to enter into a lease or to pledge

---

14. Neither of which are part of the record.

its credit. Cf. State of Alabama v. King & Boozer, 1941, 314 U.S. 1, at pages 12, 13, 62 S.Ct. 43, 86 L.Ed. 3; Curry v. United States, 1941, 314 U.S. 14, 62 S.Ct. 48, 86 L.Ed. 9; United States v. Driscoll, 1877, 96 U.S. 421, 24 L.Ed. 847.

The historic policy of the government has been to rely as far as possible and proceed within the framework of private enterprise, individual initiative and private operation of facilities. Lichter v. United States, 1948, 334 U.S. 742, 746, 755, 766–769, 68 S.Ct. 1294, 92 L.Ed. 1694; Powell v. United States Cartridge Co., 1950, 339 U.S. 497, at pages 499–500, 506–508, 70 S.Ct. 755, 94 L.Ed. 1017; United States v. County of Allegheny, 1944, 322 U.S. 174, 64 S.Ct. 908, 88 L.Ed. 1209, made no change in this respect.

Assuming as we must that the concept of fairness was the guiding rule of the parties, Joseph E. Seagram & Sons v. Bynum, 8 Cir., 1951, 191 F.2d 5, at page 11 construing the lease in the light of the contemporaneous transaction, Atlantic Greyhound Corp. v. Smithdeal, supra, 192 F.2d at page 456; Solomon v. Neisner Bros., supra, 93 F.Supp. at pages 314, 316, but cf. Joseph E. Seagram & Sons v. Bynum, supra, 191 F.2d at pages 19, 20; neither the lease itself, S. S. Kresge Co. v. Sears, 1 Cir., 1936, 87 F.2d 135, at pages 138, 140, 110 A.L.R. 583; Eddy v. Prudence Bonds Corp., supra, 165 F.2d, at page 161; Bradley v. S. S. Kresge Co., 7 Cir., 1954, 214 F.2d 692, at page 694; the interpretation placed thereon by the parties themselves, 32 Am.Jur. Landlord and Tenant, § 127, nor the surrounding circumstances, show other than that the Railroad must be treated as the lessor with a reversionary interest; Hoffman as lessee in possession with all the respective rights and obligations which the law attaches to such relationship, subject, however, to whatever rights may arise to the government as a result of the provisions therein.

In ascertaining the government's rights under the lease we must remember that "Public policy is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests. * * *" Muschany v. United States, 1945, 324 U.S. 49, at page 66, 65 S.Ct. 442, 451, 89 L.Ed. 744. "The United States, when they contract with their citizens, are controlled by the same laws that govern the citizen in that behalf. All obligations which would be implied against citizens under the same circumstances will be implied against them." United States v. Bostwick, 1876, 94 U.S. 53, at page 66, 24 L.Ed. 65; 54 Am.Jur. United States, § 62, § 73.

 The war or the conditions which followed it did not repeal, suspend or affect the provisions of the Fifth Amendment of the Constitution that private property shall not be taken for public use without just compensation. United States v. Cohen Grocery Co., 1921, 255 U.S. 81, at page 88, 41 S.Ct. 298, 65 L.Ed. 516; United States v. New River Collieries Co., 1923, 262 U.S. 341, at page 343, 43 S.Ct. 565, 67 L.Ed. 1014, and see United States v. Felin & Co., 1948, 334 U.S. 624, at page 651, 68 S.Ct. 1238, 92 L.Ed. 1614. The same considerations are to be regarded as in the sale of property between private parties. Olson v. United States, 1934, 292 U.S. 246, at page 258, 54 S.Ct. 704, 78 L.Ed. 1236; Boom Co. v. Patterson, 1878, 98 U.S. 403, at pages 407, 408, 25 L.Ed. 206; Westchester County Park Comm. v. United States, 2 Cir., 1944, 143 F.2d 688, at pages 692–693; City of New York v. Sage, 1915, 239 U.S. 57, at page 61, 36 S.Ct. 25, 60 L.Ed. 143; United States v. Douglas, 9 Cir., 1953, 207 F.2d 381, at page 384; United States v. Becktold Co., 8 Cir., 1942, 129 F.2d 473. "Such compensation means the full and perfect equivalent in money of the property taken. The owner is to be put in as good position pecuniarily as he would have occupied if his property had not been taken." United States v. Miller, 1943, 317 U.S. 369, at page 373, 63 S.Ct. 276, 279, 87 L.Ed. 336, 147 A.L.R. 55.

The provisions of the Fifth Amendment "prevents the public from loading

upon one individual more than his just share of the burdens of government * * *" and excludes taking into account as an element in just compensation "any supposed benefit * * * the owner may receive in common with all from the public uses to which his private property is appropriated * * *." Monongahela Navigation Co. v. United States, 1893, 148 U.S. 312, at page 325, 13 S.Ct. 622, 626, 37 L.Ed. 463.

■ The covenants of the lease describe the rights and obligations of the parties. Girard Trust Co. v. United States, 3 Cir., 1947, 161 F.2d 159, at page 161. Federal rights being involved we shall apply federal law. Girard Trust Co. v. United States, 3 Cir., 1945, 149 F.2d 872, at page 874. Although the meaning of "property" as used in the Fifth Amendment is a federal question, it normally obtains its content by reference to local, i. e., Pennsylvania, law. United States ex rel. T. V. A. v. Powelson, 1943, 319 U.S. 266, at page 279, 63 S.Ct. 1047, 87 L.Ed. 1390; United States v. Causby, 1946, 328 U.S. 256, at page 266, 66 S.Ct. 1062, 90 L.Ed. 1206; State of Nebraska v. United States, 8 Cir., 1947, 164 F.2d 866, at page 868; United States v. 19.86 Acres of Land in East St. Louis, 7 Cir., 1944, 141 F.2d 344, at page 346, 151 A.L.R. 1423.

■ The general rule of the common law was that whatever was once annexed to the freehold became a part of it and could not afterwards be removed except by the one entitled to the reversion or inheritance. Van Ness v. Pacard, 1829, 2 Pet. 137, at page 143, 27 U.S. 137, at page 143, 7 L.Ed. 374. Each stone and brick became part of the property as they were added to the structure. Kutter v. Smith, 1864, 2 Wall. 491, at page 499, 69 U.S. 491, at page 499, 17 L.Ed. 830. The rule was not without exceptions as between the landlord and tenant, particularly as to fixtures erected for the purpose of trade. Van Ness v. Pacard, supra, 2 Pet. at page 145, and see Anderson-Tully Co. v. United States, 5 Cir., 1951, 189 F.2d 192, at page 196. Generally, absent an agreement to the contrary, they may be removed during or upon termination of the term provided the premises are not injured and are left in good condition. Midwest Fuel & Timber Co. v. West, 10 Cir., 1939, 106 F.2d 973, at page 975. Application of the rule could be changed by express contract. Kutter v. Smith, supra, or agreement. 22 Am.Jur. Fixtures, § 17. There is abundant authority that neither the mode of annexation nor the use is conclusive,—see e. g., Seeger v. Pettit, 1875, 77 Pa. 437, 439, 18 Am.Rep. 452, 1 W.N.C. 226, as to the intention of the parties—although the presumption is that such improvement becomes a part of the freehold. Cf. Kinkead v. United States, 1893, 150 U.S. 483, at page 491, 14 S.Ct. 172, 37 L.Ed. 1152; Insurance Co. v. Haven, 1877, 95 U.S. 242, at page 245, 24 L.Ed. 473; Holt v. Henley, 1914, 232 U.S. 637, 641, 34 S.Ct. 459, 58 L.Ed. 767, and 22 Am.Jur. Id. § 40; Seeger v. Pettit, supra, 77 Pa. at page 440; Searl v. School-Dist., 1890, 133 U.S. 553, at page 561, 10 S.Ct. 374, 33 L.Ed. 740. As to the various tests and intention, see 22 Am.Jur. Fixtures § 3 et seq, § 12, § 40, § 41; Union Building Co. of Pennsylvania v. Pennell, 3 Cir., 1935, 78 F.2d 959, at pages 963, 964; Kennedy v. Crumlish, 3 Cir., 1936, 85 F.2d 665, at page 666, and cf. City of Philadelphia v. Straub, 3 Cir., 1939, 106 F.2d 172, 173, stating that "Ultimately such a rule must mean intention as to title, not as to the nature of the property, if the intention of the parties, and not a somewhat metaphysical classification, is to control. * * * For the modern test * * * the provisions of leases often afford little help, and intention is constructed by the courts from reasoning more adapted to the older conception." The Straub case has not since been cited. We humbly suggest that the suggestion as to title rather than the nature of the property in order to avoid metaphysical classification raises more questions than it solves. The rule however is subject to the qualification that where the article annexed to the freehold loses entirely the character of

personal property, or where it is so firmly affixed as to become thoroughly and substantially a part of the realty, its character as personalty will not be preserved even by a special agreement intended to accomplish that result. 22 Am.Jur. Fixtures, § 17, and see Id. § 11; cf. Holt v. Henley, supra, 232 U.S. at page 640, 34 S.Ct. at page 460; United States v. 19.86 Acres of Land in East St. Louis, supra, 141 F.2d at page 347; Wiggin Terminals, Inc., v. United States, 1 Cir., 1929, 36 F.2d 893, at page 897, and see Clayton v. Lienhard, 1933, 312 Pa. 433, at page 436, 167 A. 321, "We should ignore stubborn physical facts and settled legal principles were we to regard this apparatus as not a part of the realty. Where words and acts conflict, the intention of the parties is best determined by their acts. * * * Chattels * * * which are so annexed to the property that they cannot be removed without material injury to the real estate or to themselves; these are realty, even in the face of an expressed intention that they should be considered personalty." See supra, 312 Pa. 437, 167 A. 322, and see Schnebbe Fire Protection Engineering Corp. v. Sandt Estate, 1950, 365 Pa. 287, at page 290, 74 A.2d 104, 19 A.L.R.2d 1298.

Having covenanted to repair, it was Hoffman's obligation to do so. Girard Trust Co. v. United States, supra, 161 F.2d at page 162; Irish v. Rosenbaum Co., 1943, 348 Pa. 194, 34 A.2d 486; 32 Am.Jur. Landlord and Tenant, § 788; 51 C.J.S. Landlord and Tenant § 368(d) (1); In re Herold, D.C.N.J. 1943, 57 F.Supp. 359, 360, affirmed 3 Cir., 1944, 145 F.2d 236. The covenant to make necessary repairs required Hoffman to make such repairs as were necessary for the use of the leased premises by it for the purpose for which they were leased. 32 Am.Jur. Id. § 789, p. 673, 674, Note 45 A.L.R. 12, at page 24; 51 C.J.S. Landlord and Tenant § 368(4) (a), p. 1093.

As to replacements and the duty of restoration, see 22 Am.Jur. Id. § 40, p. 751. Even absent an express covenant there is an implied obligation on the lessee to treat the property in such a manner that no injury be done to the inheritance, and to return the property to the lessor in as good condition as received, ordinary wear and tear excepted. United States v. Jordan, 6 Cir., 1951, 186 F.2d 803, at page 806; United States v. 14.4756 Acres of Land, etc., D.C.Del.1947, 71 F.Supp. 1005, at page 1008; cf. United States v. 16.747 Acres of Land, etc., D.C.Del.1943, 50 F.Supp. 389, and see Seeger v. Pettit, supra, 77 Pa. at page 441.

Although the possibility of structural damage was contemplated, the commission found, and on this question of fact we agree, see Burkhart v. United States, 9 Cir., 1955, 227 F.2d 659, at page 661; Seeger v. Pettit, supra, 77 Pa. at page 441, there was no intention to negate the tenant's obligation or the owner's rights as to the items, Note 11 supra, which became an integral part of the freehold since most of them could not possibly be removed and, if removable, it could only be accomplished at far more cost than they were worth. If the parties intended otherwise they should have said so. To construe the language used to have such meaning would be to read into the lease a covenant which in our judgment did not exist. See Sheets v. Selden, supra, 7 Wall. at page 423, 74 U.S. at page 423, "The tendency of modern decisions is not to imply covenants which might and ought to have been expressed, if intended."

We hold therefore that in arriving at just compensation the Railroad was entitled to the fair market value of the property as thus enhanced. In accord, see United States v. 5 Parcels of Land, etc., supra, 180 F.2d 75, 77, a case quite apposite except that only filling, leveling and grading of land was there involved.[15] Seeking to abrogate the law of landlord and tenant the government objected to

15. The basic reasoning for the holding is more fundamental than the difference between improvements to and on the land.

having to pay for increased value occasioned by its own improvements.[16]

Pointing out that there was nothing in its holding contrary to a long line of cases involving improvements to leased lands by the condemnor before condemnation, or those cases where the condemnor had in good faith gone upon the lands and erected improvements in the bona fide belief that he had the right so to do, or where the circumstances were such that equity ought to hold that the condemnor who owned the improvements had the right to remove same, the court stated, "However, we have neither of these conditions here. The United States was not authorized to take back the fill or to undo the leveling or to fill up the dredging. The dredging, filling and leveling were done in furtherance of the purpose for which it had leased the lands, and were normal, incidental, and contemplated fruits of the leases which rightfully inured to the landowners and reverted to them at the end of the leases. The landowners had the right to receive the land back at the termination of the lease with the structures and facilities removed. But the leveling and filling of the land were not removable improvements within the contemplation and meaning of the provisions in the leases allowing removal by the lessee of facilities or improvements constructed on the lands. * * * That the United States would improve landowners' property by dredging, filling, and leveling was within the intent, purpose, and contemplation of the parties to the leases; that the United States would spend large sums of the taxpayers' money to disimprove, or unfill, or unlevel the lands upon the termination of the lease is fantastic and unthinkable, and not within the intent of the parties to the leases. The right to receive the lands back with the improvements *to* the lands as distinguished from improvements *on* the lands was a right implied in the leases that inhered in the landowners. This, together with the fee title, the Government condemned and took, and under the Fifth Amendment the landlowners are entitled to receive just compensation therefor. * * * These contracts being valid and binding, the Government cannot, by determining that it wants to take entire title, abrogate, annul, or set at naught the lawful rights, privileges, and property of its lessees acquired under these contracts."

See and cf. the rationale of United States v. Certain Parcels of Land, etc., D.C.D.Md.1944, 55 F.Supp. 257.

United States v. Certain Parcels of Land in Warren County, D.C.W.D.Va. 1949, 90 F.Supp. 27, involved walks, service driveways, underground utilities and roads, which the lease stated should on termination become the property of the owner. The court held, stressing the

16. The lease contemplated dredging—consent was given to deposit the spoil; filling and leveling were incidental; the government had the right to remove facilities and improvements placed upon the lands. No one questioned such right; no attempt to obtain payment therefor. The difference in value was substantial. The work was done solely for the purpose for which the lands were leased. The right to the reversion, i. e., the lands in their improved condition, could not be disputed. The government insisted the landowner should not be paid anything for any fruits of the lease other than rental.

The government would have us accept the reasoning of the dissenting opinion. It had the right to nullify improvements; but it didn't. It could have condemned in the beginning; but it didn't. In Searl v. School-Dist., supra, 133 U.S. 553, 10 S.Ct. 374, 33 L.Ed. 740, the district purchased land from the supposed owner and built a school house; upon condemnation the lawful owner sought to have the value of the school included as "just compensation". The claim was quite properly denied. The statement, 133 U.S. at page 561, 10 S.Ct. at page 376 is not inconsistent with our holding. Old Dominion Land Co. v. United States, 1925, 269 U.S. 55, 46 S.Ct. 39, 70 L.Ed. 162, involved the right to remove warehouses, a right readily admitted here. In United States v. 6.74 Acres of Land, etc., 5 Cir., 1945, 148 F.2d 618, 620, upholding the right of the government as lessee to condemn, the court stated, "The United States, notwithstanding such contractual right, could always acquire a *greater interest* in the property than it already possessed." (Italics supplied.)

intention of the parties, the provision was a primary and essential consideration in the granting the lease; that the government was bound by its contract, subject to the same rules as private parties; that the owner was entitled to the reversion; and finally that it was not "ridiculous" nor "unjust" that it should pay its present value.

In Anderson-Tully Co. v. United States, supra, 189 F.2d 192, no question was raised as to the earth fill, mooring pilings, or warehouses. The problem was whether the trial judge erred in excluding evidence as to value of "piling structures" erected by the government as lessee of the property. The court recognizes the exception, 189 F.2d at page 196, "not intended to irrevocably become a part of the realty", citing Futrovsky v. United States, 1933, 62 App.D.C. 235, 66 F.2d 215, and see Potomac Electric Power Co. v. United States, 1936, 66 App.D.C. 77, 85 F.2d 243, at pages 247–248; United States v. Four Parcels of Land in City of New York, D.C.S.D.N.Y. 1937, 20 F.Supp. 306, at pages 307–308.

▉▉ Implicit in the argument of the government in these cases is the espousal of a doctrine that in time of war or where the government is a party to litigation, well settled principles of law should not prevail. The fundamental idea of the government of the United States as created by the Constitution is that it is a government of laws and not of men. 54 Am.Jur. United States, § 4, p. 522, § 116, p. 627; E. C. Shevlin Co. v. United States, 9 Cir., 1944, 146 F.2d 613, at page 615; Jones v. Watts, 5 Cir., 1944, 142 F.2d 575, at page 577, 163 A.L.R. 240; Brent v. Bank of Washington, 1836, 10 Pet. 596, at page 614, 35 U.S. 596, at page 614, 9 L.Ed. 547; Curtner v. United States, 1893, 149 U.S. 662, at page 671, 13 S.Ct. 985, 1041, 37 L.Ed. 890. The provisions of the Fifth Amendment and the teachings of the United States Supreme Court are to the effect that the ascertainment of compensation is a judicial function and no power exists in any other department of the government to declare what the compensation shall be or to prescribe any binding rule in that regard. Monongahela Nav. Co. v. United States, supra, 148 U.S. at page 327, 13 S.Ct. at page 626.

▉▉ The measure of compensation is a federal question. United States v. Miller, supra, 317 U.S. at pages 379, 380, 63 S.Ct. at pages 282, 283; Kinter v. United States, 3 Cir., 1946, 156 F.2d 5, 6, 172 A.L.R. 232. The burden of establishing value of the property condemned is upon the property owner. United States ex rel. T. V. A. v. Powelson, supra, 319 U.S. at pages 273–274, 63 S.Ct. at pages 1051, 1052; United States v. 26.07 Acres of Land, etc., D.C.E.D.N.Y. 1954, 126 F.Supp. 374, at page 377. Value is to be ascertained as of the date of taking, i. e., August 23, 1954. United States v. Miller, supra, 317 U.S. at page 374, 63 S.Ct. at page 280.

▉ In an effort to find some practical standard, the courts early adopted and have retained the concept of market value. The test is objective. The owner is entitled to the "fair market value" of what is taken, i. e., "what 'it fairly may be believed that a purchaser in fair market conditions would have given' "; "what a willing buyer would pay in cash to a willing seller". United States v. Miller, supra, 317 U.S. at page 374, 63 S.Ct. at page 280; United States v. Toronto, Hamilton & Buffalo Nav. Co., 1949, 338 U.S. 396, at page 402, 70 S.Ct. 217, 94 L.Ed. 195.[17]

---

17. "* * * the amount that in all probability would have been arrived at by fair negotiations between an owner willing to sell and a purchaser desiring to buy." Olson v. United States, supra, 292 U.S. at page 257, 54 S.Ct. at page 709. "* * * what a hypothetical willing seller would part with the land for and what an equally hypothetical buyer would give for it." Baetjer v. United States, 1 Cir., 1944, 143 F.2d 391, at page 396. "* * * a hypothetical concept based upon what, in the opinion of those who know, a willing buyer would have to pay a willing seller of property in order to purchase it." United States ex rel. T.V.A. v. Powelson, supra, 4 Cir., 138 F.2d 343, 345. "* * * not

"Perhaps no warning has been more 'repeated than that the determination of value cannot be reduced to inexorable ·rules." United States v. Toronto, etc., Nav. Co., supra, 338 U.S. at page 402, 70 S.Ct. at page 221. It ·is not a matter of formula, United States v. Miller, supra, 317 U.S. at pages 373–374, 63 S.Ct. at pages 279, 280; ·United States v. Cors, 1949, 337 U.S. 325, at page 332, 69 S.Ct. 1086, 93 L.Ed. 1392; United States v. Commodities. Trading Corp., 1950, 339 U.S. 121, at page 123, 70 S.Ct. 547, 94 L.Ed. 707.

When the court adopts the standards of the market place in making valuations, there is no reason why, it should close its eyes to how the market place arrives at and applies the standards. Cade v. United States, 4 Cir., 1954, 213 F.2d 138, at pages 140, 141. The determination is to be made in the light of all relevant and material facts affecting market value that are shown by the evidence taken in connection with those of such general notoriety as not to require proof, taking into account all considerations that fairly might be brought forward and reasonably be given substantial weight in such bargaining. Olson v. United States, supra, 292 U.S. at page 257, 54 S.Ct. at page 709; all facts which an ordinarily prudent man would take into account before forming a judgment as to the market value of property he contemplates purchasing. Cade v. United States, supra, 213 F.2d at page 141; United States v. Ham, 8 Cir., 1951, 187 F.2d 265, at page 267.

Finally, there must be a reasonable judgment having its basis in a proper consideration of all the relevant facts appearing in the evidence. Standard Oil Co. of New Jersey v. Southern Pacific Co., 1925, 268 U.S. 146, at page 156, 45 S.Ct. 465, 69 L.Ed. 890.

The measure is the owner's loss, · not the taker's gain. United States ex rel. T. V. A. v. Powelson, supra, 319 U.S. at page 281, 63 S.Ct. at page 1055; see and cf. at page 282, 63 S.Ct. at page 1056.

"It may be more or less than the owner's investment." Olson v. United States, supra, 292 U.S. at page 255, 54 S.Ct. at page 708. "He must be made whole but is not entitled to more. It is the property and not the cost of it that is safeguarded * * *. Just compensation includes all elements of value that inhere in the property, but it does not exceed market value fairly determined. · The sum required to be paid the owner does not depend upon the uses to which he has devoted his land but is to be arrived at upon just consideration of all the uses for which it is suitable.[18] The highest and most profitable use for which the property is adaptable ·and needed or likely to be needed in the reasonably near future is to· be considered, not ·necessarily as the measure of value, but ·to the full extent that the prospect of demand for such use affects the market value while the property·is privately held. * * *" Olson v. United States, 292 U.S. at page 255, 54 S.Ct. at page 708.

Where there is market price prevailing at the time and place of taking, that price is just compensation. L. Vogelstein & Co., Inc., v. United States, 1923, 262 U.S. 337 at page 340, 43 S.Ct. 564, 67 L.Ed. 1012; United States v. New River Collieries, supra, 262 U.S. at page 344, 43 S.Ct. at page 567. Where, for any reason, property has no market, resort must be had to other data to ascertain its value, and even ·in the ordinary case, assessment of market value involves the use of assumptions, which make it unlikely that the appraisal will reflect true value with nicety. Where the property

what a tribunal at a later date may think a purchaser would have been wise to give * * *." City of New York v. ·Sage, 1915, 239 U.S. 57, 61, 36 S.Ct. 25, 26, 60 L.Ed. 143, and see Hudson Coal Company's Appeal, 1937, 327 Pa. 247, at page 251, 193 A. 8..

18. (Footnote inserted). The best avail-

able use to which it may readily be converted. Boom Co. v. Patterson, 1878, 98 U.S. 403, at page 408, 25 L.Ed. 206; United States ex rel. T.V.A. v. Powelson, supra, 319 U.S. at page 275, 63 S.Ct. at page 1052; United States v. Causby, supra, 328 U.S. at page 261, 66 S.Ct. ·at page 1065.

taken, or that in its vicinity, has not in fact been sold within recent times, or in significant amounts, the application of this concept involves, at best, a guess by informed persons. United States v. Miller, supra, 317 U.S. at pages 374–375, 63 S.Ct. at page 280; see United States v. Toronto, etc., Nav. Co., supra, 338 U.S. at page 407, 70 S.Ct. at pages 223, 224.[19]

The Railroad, presenting its case as to valuation, offered three witnesses, Lawrence F. Doud, Sidney Hinerfeld, and Harry M. Gordon, all of whom as reputable, experienced, competent and able realtors in the City of Scranton, were familiar with the property in question. Each made an examination of the property, structures and improvements; study and research; for the purpose of arriving at an opinion as to the fair market value. Each considered the economic factors of the community at large, location, municipal and governmental services and facilities, utilities, transportation, availability of two railroads, railroad sidings, highways, truck, airline and bus services; availability of coal, gas and water; good climate; abundant labor supply, recreational facilities; the property and its appointments; the third estate, use and adaptability. All three witnesses and George S. Potter, a reputable, experienced, competent real estate broker and appraiser from New York City, who testified for the government, agreed that of the three conventional or orthodox methods of appraising a property, reproduction cost new less depreciation—the summation approach—was not, under the circumstances, applicable.

The witness Doud testified it was impossible to use the market data (comparative or comparable) method or approach because in his opinion there was nothing of a comparable nature in the area on which to base any figures. Cf. United States v. Lambert, 2 Cir., 1944,

146 F.2d 469, at page 472; United States v. .44 Acres of Land, D.C.S.C.1954, 121 F.Supp. 862, at page 871, citing 4 Nichols on Eminent Domain, p. 59. Considering the aforementioned basic factors and using the income data approach, his opinion of the fair market value of the property in question as of August 23, 1954, the date of taking, was "somewhere between $3,500,000 and $4,000,000." This result was reached by capitalizing the $400,000 net rental from the existing lease at a 10% and 12% rate.

The witness Hinerfeld, who specializes in management rental and sales of commercial and industrial property in the area, cf. Cades v. United States, supra, 213 F.2d at page 140, considering, in addition to the basic factors, surplus labor within the context of supply and demand, the existing lease, giving some but not much consideration to the option —see cases supra, 154 F.Supp. 778—using the market data or comparable, and the capitalization of income approaches, testified that at a reasonable and basic minimum the fair market value of the property as of the date of taking was $2,250,000.

In capitalizing income he recognized the existing lease at a $400,000 net annual rental but stated that it was unusual because of the fifteen month original term and the possibility of four annual renewals or options. Usually leases for industrial properties are for a longer term. Because of the risk of early termination, balanced with the stability of the tenant, i. e., Hoffman, and the investment involved, he first used a capitalization rate of 18%, which he testified was unusually high for industrial real estate which can generally sell at 10 to 12 or 13%. Considering the possibility of an early termination of the lease and that the next tenant may not be able to utilize all of the unique factors of the property or that the change might occur when there was a declining market in

19. No more than an approximation. Welch v. T. V. A., 6 Cir., 1939, 108 F. 2d 95, at page 100. " * * * a guess, as well informed as possible, as to what the equivalent would probably have been had a voluntary exchange taken place."

Kimball Laundry Co. v. United States, 338 U.S. 1, at page 6, 69 S.Ct. 1434, 1438, 93 L.Ed. 1765, and see Montana Ry. Co. v. Warren, 1890, 137 U.S. 348, at page 353, 11 S.Ct. 96, 34 L.Ed. 681.

the industrial field, because industrial values fluctuate, based upon his experience and knowledge of rentals in the industrial field in the area, he testified that existing rates were from 50¢ to 92¢ a square foot. He then set up a hypothetical rental of 60¢ a square foot for the property in question, i. e., a figure that some other tenant may at some future time be willing to pay—i. e., gross rental, not net as here—because in the industrial field leases are generally made on that basis. Capitalizing income on the basis of such a hypothetical rental, he testified that 450,000 sq. ft. would yield $270,229 (sic N.T. p. 224); deducting normal fixed expenses which on a gross lease every landlord has, i. e., taxes roughly $39,963, fire insurance $1,747, liability insurance $500, structural repairs $2,798, or a total of $45,000, he arrived at a net rental of $225,229. Capitalized at 10% and projecting it over a reasonable period of years, he testified that in his opinion the property could sell for $2,250,000.

Testifying that there was no property in the area exactly comparable in size, construction or appointments, but that there were sales of other industrial properties with non-conforming features; using judgment based on experience, he tried to get as close to comparables as

possible. Citing five sales;[20] comparing the conforming and non-conforming features with the appointments and favorable features of the subject property, he stated that its absolute minimum fair value was $5 a square foot, and that for 450,000 sq. ft. the fair market value as of the date of taking was $2,250,000.[21]

The witness Gordon, using the capitalization of income and market data or comparable approaches, arrived at the same value as Hinerfeld, i. e., $2,250,000.

The witness Potter for the government, unfamiliar with the property, sales or rentals in the area,[22] when engaged by the government, examined the property, photographs and reports by those in charge and made an independent study and research. Considering some sales and rentals of what he considered comparable properties in the area and many others from what he considered competitive areas—other parts of Pennsylvania, Connecticut, New York, New Jersey, Illinois[23]—using the capitalization of income and market data approaches, he testified that in his opinion the fair market value of the property as of the date of taking, considering it as 480,000 sq. ft. at $2.08 per square foot was $1,000,000.

The witness did not consider the lease, the $400,000 net rental[24] or the option

20. Stating he would cite more if requested.

21. 39,000 sq. ft. of basement space under a casting platform were not included in the calculations. At 60¢ an increase in gross rental of $23,400 at 10%, $234,000; at $5 per square foot, $195,000. Non constat the witness stated his opinion overall of the fair market value to be $2,250,000. N.T. 216, 243–248, 286–289.

22. Cf. United States v. 13,255.53 Acres of Land, etc., 3 Cir., 1946, 158 F.2d 874, at page 876; United States v. Certain Parcels of Land in City of Philadelphia, 3 Cir., 1944, 145 F.2d 374, 375, 159 A.L.R. 1; United States v. 5139.5 Acres of Land, etc., 4 Cir., 1952, 200 F.2d 659, at page 662; Kimball Laundry Co. v. United States, supra, 166 F.2d at page 862, reversed on other grounds, 338 U.S. 1, 69 S.Ct. 1434, 93 L.Ed. 1765; International Paper Co. v. United States, 5 Cir., 1955, 227 F.2d 201, at pages 208–209.

23. Cf. United States v. Ham, supra, 187 F.2d at page 269; United States v. Toronto, etc., Nav. Co., supra, 338 U.S. at page 404, 70 S.Ct. at page ——.

24. Rental value is always admissible. Welch v. T. V. A., supra, 108 F.2d at page 100; United States v. Shingle, 9 Cir., 1937, 91 F.2d 85, at page 89; Westchester County Park Comm. v. United States, supra, 143 F.2d at page 693; Demetria Sifuentes v. United States, 1 Cir., 1948, 168 F.2d 264, at page 266; Chicago, B. & Q. R. Co. v. North Kansas City Development Corp., 8 Cir., 1943, 134 F.2d 142, at page 152; United States v. Certain Parcels of Land in City of Philadelphia, supra, 215 F.2d 140; United States v. Certain Lands in City of Newark, 3 Cir., 1950, 183 F.2d 320, at page 322.

Government counsel argues the rental was exorbitant. Mr. Hinerfeld at the time deposed that it was fair and reasonable. Mr. Potter considered the

as factors in determining fair market value. Land value was placed at $5000 [25] an acre or $80,000,[26] about the same figure as the assessed valuation. Cf. United States v. Delano Park Homes, Inc., 2 Cir., 1944, 146 F.2d 473, at page 474; Berger v. Public Parking Authority of Pittsburgh, 1954, 380 Pa. 19, at page 27, 109 A.2d 709. Gross rental was estimated to be $192,000; [27] net $111,400 —attributable to improvements. Capitalized at the suggested rate, the result was $1,011,178 for improvements; adding $80,000 land value made a total $1,092,000; less 10% or $109,200, because of the wall and land conditions, left a balance of $982,800. Including the items in Note 11, but excluding facilities and equipment, $1,000,000 was the capital value.[28]

The commission, the better to understand, weigh and appraise the testimony, conducted a view and inspection of the premises, Forbes v. United States, 5 Cir., 1920, 268 F. 273, at page 277; Woodlands Cemetery Co. v. United States, D.C.E.D.Pa.1953, 110 F.Supp. 704; Shoemaker v. United States, 1893, 147 U.S. 282, at page 306, 13 S.Ct. 361, 37 L.Ed. 170; Columbia Heights Realty Co. v. Rudolph, 1910, 217 U.S. 547, at page 560, 30 S.Ct. 581, 54 L.Ed. 877. Expert opinions as to value are not to be passively received or blindly followed. They should be judged in the light of all the testimony and the commission's general knowledge of affairs and given such consideration as they believe them entitled to receive. Cf. 18 Am.Jur. Eminent Domain, § 355, p. 999. The commis-

rental and option figures incompatible with each other and with his opinon of fair rental and fair market value. As to the option, see cases cited supra 154 F.Supp. 778, a continuing offer to sell; possibly an attempt to preserve the status quo; to protect an investment; to prevent sale to another. The question was one of weight, not admissibility. We assume the suggestion to be one of improvidence, not illegality. Cf. Commercial Station Post Office, Inc., v. United States, 8 Cir., 1931, 48 F.2d 183, at page 186; Girard Trust Co. v. United States, supra, 149 F.2d at page 874. Absent fraud the terms of the instrument must prevail. Moiger v. Johnson, 1950, 86 U.S.App.D.C. 219, 180 F.2d 777, 778; Willard v. Tayloe, supra, 75 U.S. at page 573.

It is a matter of public importance that good faith conduct of the United States should not be lightly invalidated. Where there is a choice a court will prefer that construction which is lawful. Eddy v. Prudence Bonds Corp., 2 Cir., 1947, 165 F.2d 157, at page 161.

"The presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." United States v. Chemical Foundation, Inc., 1926, 272 U.S. 1, at pages 14–15, 47 S.Ct. 1, at page 6, 71 L.Ed. 131; Ross v. Reed, 1 Wheat. 482, at pages 486, 487, 14 U.S. 482, 4 L.Ed. 141; Shanks Village Comm. Against Rent Increases v. Cary, 2 Cir., 1952, 197 F.2d 212, at page 217; Fletcher v. Jones, 1939, 70 App.D. C. 179, 105 F.2d 58, at page 61; Nofire v.

United States, 164 U.S. 657, at page 660, 17 S.Ct. 212, 41 L.Ed. 588.

25. Cf. a recent prior sale at more than $300,000. The witness stated a large part of such property was not at street level; that it was "on the wrong side of the tracks"; the intervening main line of the railroad was an economic barrier; a large part of the perimeter was supported by a retaining wall; criticized the arrangment of the buildings; lack of an independent heating plant; surplus labor not a significant factor.

26. A figure suggested to be about 25% of the fair market value. The witness testified the only consideration given to the assessed value was as a basis for ascertaining the prospective tax burden.

27. Less 10% vacancy and land loss, $19,-200; estimated expenses $56,600 (real estate taxes $40,000, fire insurance $2100, commissions $3,500, building reserve $11,000); 6% land value $4,800; 10% a fair rate of return over a 25 year period, (discounted present value 9.-077).

28. We note in passing that in appraising the property as of August 23, 1954, assuming physical conditions as of January 1, 1953, the witness appraised the property at $730,000 less 10% because of land and wall conditions, leaving a balance of $657,000. Using the market data approach his figure was $700,000. The difference between 1953 and 1954 was attributed largely to deferred maintenance. The witness Hinerfeld testified that as of January 15, 1953, the value of the property was $2,000,000.

sion however cannot act in any case upon particular facts material to its disposition resting in their private knowledge (Welch v. T. V. A., supra, 108 F. 2d at page 101) but should be governed by the evidence adduced. They may, however, and to act intelligently they must, judge of the weight and force of the evidence by their own general knowledge of the subject of inquiry. Head v. Hargrave, 1881, 105 U.S. 45, at page 49, 26 L.Ed. 1028; United States v. 2.4 Acres of Land, etc., 7 Cir., 1943, 138 F.2d 295, at page 297; International Paper Co. v. United States, 5 Cir., 1955, 227 F.2d 201, at page 205; Sartor v. Arkansas Natural Gas Corp., 1944, 321 U.S. 620, at pages 627–628, 64 S.Ct. 724, 88 L.Ed. 967; United States v. Certain Lands located in Town of Highlands, D.C.S.D.N.Y.1944, 57 F.Supp. 96, at page 98.

Considering the matter—the whole record—from all angles, the commission did not accept in full the opinions of the witnesses for either side as to fair market value. Applying their own general knowledge and ideas to the facts and evidence, i. e., that which was material, relevant and competent, they concluded that the fair market value of the property as of the date of taking was $1,720,-700.

The findings and conclusions of the commission are supported by substantial evidence; the amount of the award is within the range of the estimates given by competent witnesses. The question of just compensation was one of fact for the commission. They have decided it in a fair and lawful manner. See United States v. Certain Lands in the City of Newark, supra, 183 F.2d at page 322; Porrata v. United States, 1 Cir., 1947, 158 F.2d 788, at page 791; Phillips v. United States, 2 Cir., 1945, 148 F.2d 714, at page 716; and see United States v. Certain Parcels of Land, etc., supra, 215 F.2d at page 145.

All of the findings of fact and conclusions of law of the commission are adopted; incorporated herein by reference; and affirmed.